Filed 12/14/18

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE SUPERIOR COURT OF FRESNO COUNTY, <br><br> Petitioner, <br><br> v. <br><br> PUBLIC EMPLOYMENT RELATIONS BOARD, <br><br> Respondent; <br><br> SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 521, <br><br> Real Party in Interest. | F075363 <br><br> (PERB Dec. No. 2517-C, Case No. SA-CE-14-C) <br><br><br> **OPINION** |

ORIGINAL PROCEEDING; petition for writ of review.

Wiley Price & Radulovich, Joseph E. Wiley and Suzanne I. Price for Petitioner.

J. Felix De La Torre, Wendi L. Ross and Brendan P. White for Respondent.

Weinberg, Roger & Rosenfeld, Kerianne R. Steele and Anthony J. Tucci for Real

Party in Interest.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

In this original proceeding, the Superior Court of Fresno County (Court) challenges a decision by the Public Employment Relations Board (PERB) that certain Court personnel rules and regulations (Personnel Rules) violate the Trial Court Employment Protection and Governance Act (Trial Court Act) (Gov. Code, § 71600 et seq.)[1] and, thus, constitute unfair practices. The initial administrative proceedings were brought by Service Employees International Union Local 521 (Union) after Court adopted new Personnel Rules affecting Union members. Respondent PERB is a quasi-judicial agency of the State of California charged with administering the provisions of the Trial Court Act. (§ 71639.1.) Union, the real party in interest, is and at all relevant times has been the "recognized employee organization" representing employees of Court. (§ 71691, subd. (h).)

The Personnel Rules in question prohibit Court's employees from (1) wearing clothing or adornments with writings or images, including pins, lanyards and other accessories; (2) soliciting during working hours for any purpose without prior Court approval; (3) distributing literature during nonworking time in working areas; and (4) displaying writings or images not published by Court in work areas visible to the public. Relevant to the issues raised in this writ, PERB found several aspects of the rules improper with respect to Union members and thus constitute unfair practices. PERB concluded rules prohibiting employees from wearing certain clothing anywhere in the courthouse and from displaying images that are not published by Court in work areas visible to the public overly broad and interfered with rights protected by the Trial Court Act. It also determined the restriction on soliciting during work hours and the ban on distributing literature in working areas were ambiguous and overly broad. Relatedly, PERB considered and upheld its authority to remedy these violations and ordered Court to rescind the rules.

---

[1] All unlabeled statutory references are to the Government Code.

2.

The case now reaches this court via writ proceedings. Within the many issues raised are important questions regarding Court's authority to impose workplace rules to ensure Court appears impartial in all cases it hears and PERB's authority to impose remedies for the perceived violations in Court's workplace actions. As set out more fully below, we find Court has a substantial interest in regulating its workforce to ensure that the judicial process appears impartial to all appearing before it. Under the existing law and the facts presented regarding interactions with the public in the relevant courthouses, this interest is sufficient to justify the broad restrictions on employee clothing adopted in this case. Furthermore, we conclude, contrary to PERB's findings, that the bans on soliciting during working hours and displaying images in areas visible to the public are not ambiguous and thus were properly adopted. However, we do agree with PERB that the regulations prohibiting the distribution of literature in working areas is ambiguous as to the meaning of "working areas." In line with this conclusion, we agree with PERB that separation of powers concerns do not prohibit PERB from imposing a remedy with respect to that regulation.

We therefore affirm PERB's decision invalidating the rule prohibiting the distribution of literature but otherwise set aside PERB's remaining conclusions.

## FACTUAL AND PROCEDURAL BACKGROUND

In general terms, this case is a dispute between Court and its employees. Court had approximately 550 employees at 11 facilities. Union is the exclusive representative of Court's employees. Represented employees include approximately 63 office assistants, 200 judicial assistants, five account clerks, 42 court reporters and 14 marriage and family counselors. The employees work in various areas, including courtrooms, customer service windows, workstations behind customer service windows, offices near judges' chambers, and separate offices. These work areas are visible to the public in varying degrees. Moreover, many employees regularly move throughout the courthouse as part of their duties, either going to and from courtrooms and judicial chambers,

3.

transferring files, or traveling in public areas and on public elevators for official business. They may even travel between courthouse buildings. Other employees, such as clerks and court reporters, work within courtrooms and travel between different courtrooms. Finally, some relevant employees work as counselors, meeting with the public as part of their duties and traveling throughout the courthouse and their offices in view of the public.

***Adoption of Personnel Rules***

In 2009, representatives of Court met and conferred with representatives of Union on four occasions to discuss proposed amendments of Court's Personnel Rules. No agreement was reached as to the provisions disputed in this proceeding. Regardless, Court chose to implement the new Personnel Rules, including the disputed provisions, on December 1, 2009, and included them in Court's "Personnel Manual Amended 2009." The disputed provisions are parts of Personnel Rules 1.11 (Dress and Appearance) and 17.3 (Solicitation and Distribution Policy).

Personnel Rule 1.11 sets forth the general requirement that "Court employees must dress in a professional, business-like manner" and provides a list of items employees may not wear, such as jean pants, slippers, tennis shoes and casual sandals. In addition, Court's employees may not wear "[c]lothing and/or adornments with writings or images, including but not limited to pins, lanyards, or any other accessories (except for Court-approved clothing and/or adornments bearing the Court logo)."[2]

Personnel Rule 17.3 sets forth the rules that apply to employee activity on Court's property involving: (1) solicitations; (2) distribution of literature; and (3) displays of writings or images. Personnel Rule 17.3.1 contains a lead-in sentence followed by four

---

[2] The rule also provides: "Employees with questions regarding the appropriateness of business attire should request clarification from their supervisor or manager. Violations of these policies will result in, at minimum, the employee utilizing their own time to change the inappropriate item, and at maximum, lead to disciplinary action."

4.

paragraphs containing restrictions. The first of these four paragraphs addresses solicitations by employees while on Court's property by stating:

"[1] Employees of the Court may not solicit during *working hours* for any purpose unless pre-approved by the CEO [Court Executive Officer]. *Working time* is defined in the following section." (Italics added.)

The "following section" is Personnel Rule 17.3.2, which defines "working time" as follows:

"Working time includes the working time of both the employee doing the soliciting and distributing and the employee to whom the soliciting is being directed. Working time does not include break periods, meal periods, or any other specified periods during the workday when employees are properly not engaged in performing their work tasks."

The second and third paragraphs following the lead-in sentence of Personnel Rule 17.3.1 address the distribution of literature by employees by stating:

"[2] Employees of the Court may not distribute literature during working time for any purpose. Working time is defined in the following section.

"[3] Employees of the Court may not distribute literature at any time for any purpose in working areas."

The second paragraph's prohibition of distributions is limited to "working time." As a result, the practical reach of the third paragraph's "any time" prohibition is limited to distributions that occur during *nonworking time*. Those nonworking time distributions are barred "in working areas."

The fourth paragraph of Personnel Rule 17.3.1 addresses the display or writing and images by employees on Court's property: "[4] Employees of the Court may not display writings or images that are not published by the Court in work areas that are visible to the public."

In sum, these provisions prohibit employees from (1) wearing clothing or adornments with writings or images, including pins, lanyards and other accessories; (2) soliciting during working hours for any purpose without prior Court approval; (3)

5.

distributing literature (a) during working time and (b) during nonworking time in working areas; and (4) displaying writings or images not published by Court in work areas visible to the public.

***Evidence Regarding the Code of Ethics for Court's Employees***

In addition to the disputed regulations, Court presented evidence demonstrating that employees were already subject to a code of ethics for court employees. The Code of Ethics for the Court Employees of California (Code of Ethics) contains an introductory paragraph that states in part:

> "A fair and independent court system is essential to the administration of justice in a democratic society. Exemplary conduct by court employees inspires public confidence and trust in courts, and conveys the values of impartiality, equity, and fairness that bring integrity to the court's work. Further, court employees are expected to adhere to a high standard of ethical behavior."

The Code of Ethics contains 12 tenets. The first tenet directs Court's employees to "[p]rovide impartial and evenhanded treatment of all persons." Other tenets address how Court's employees should appear to members of the public. For instance, the sixth tenet directs Court's employees to "[a]void any appearance of impropriety that might diminish the integrity and dignity of the court." The seventh tenet directs Court's employees serving the public to provide accurate information about court processes without "appearing to favor one side of a case."

The Code of Ethics and related guidelines were drafted by the Administrative Office of the Court and approved by the Judicial Council of California. They were provided to California trial courts, which were free to adopt them or not. Court adopted both the Code of Ethics and the guidelines. The guideline explaining the first tenet (impartiality) provides in part:

> "While every court employee has the right to freedom of association and political expression, he or she does not have the right to take sides in a legal dispute … or give *the appearance of partiality on any issue that is likely to*

6.

*come before the court.*  The procedural integrity of the court must be protected at all times."  (Italics added.)

The Judicial Council is a constitutionally created body.  (Cal. Const., art. VI, § 6; see *Reimel v. Alcoholic Beverage Control Appeals Bd.* (1967) 254 Cal.App.2d 340, 345.) Article VI, section 6, subdivision (d) of the California Constitution directs the Judicial Council to "make recommendations to the courts" to improve the administration of justice.  The Code of Ethics and related guidelines is an example of a recommendation made by the Judicial Council in accordance with this constitutional directive.

*Unfair Labor Practice Charge and Underlying Proceedings*

In March 2010, Union filed an unfair practice charge that alleged Personnel Rules 1.11 and 17.3 violated the Trial Court Act.  In May 2010, PERB's Office of General Counsel issued a complaint based on that charge.  The complaint alleged Court violated sections 71631 and 71635.1 by implementing Personnel Rules 1.11 and 17.3 and alleged implementing the rules was an unfair practice under section 71639.1, subdivision (c) and California Code of Regulations, title 8, section 32606, subdivision (a).[3]  The complaint referred to Personnel Rule 1.11's prohibition against employees wearing clothing or adornments with writings or images, which included pins, lanyards and other accessories. It also stated Personnel Rule "17.3 prohibited employees … from soliciting or distributing literature during working hours 'for any purpose unless pre-approved by [Court]' " and prohibited employees from displaying writings or images not published by Court in work areas visible to the public.  The complaint challenged prohibitions against four types of employee actions—namely, wearing, soliciting, distributing and displaying.

In June 2010, Court answered the complaint and alleged an affirmative defense based on the separation of powers doctrine.  A two-day formal hearing was conducted

---

[3]      "PERB Regulation(s)" refers to the regulations governing unfair practice proceedings before PERB, which are set forth in California Code of Regulations, title 8, sections 32600 through 32690.

7.

before an administrative law judge (ALJ) in March 2011.  In May 2011, Court and Union filed their opening posthearing briefs.  In June 2011, each side filed reply briefs.

In July 2011, in response to an argument raised in Court's reply brief, Union moved to amend the complaint to conform to proof or, alternatively, for the consideration of an unalleged violation involving Personnel Rule 17.3.1's prohibition of distributions of literature at any time for any purpose *in working areas*.  The complaint originally referred to the prohibition against "soliciting or distributing literature during working hours 'for any purpose unless pre-approved by the [Court Executive Officer].' "  The amendment sought to delete the reference to distributing literature from this sentence and add a new sentence that referred to the prohibition against "distributing literature during working time for any purpose, and at any time for any purpose in working areas."  Court opposed the amendment.

In July 2014, the ALJ issued a proposed decision.  The proposed decision addressed prohibitions against four types of employee actions:  (1) wearing union regalia; (2) soliciting; (3) distributing literature; and (4) displaying writings or images.  The proposed decision stated the ban on solicitations was appropriate and the other three prohibitions violated the Trial Court Act because they were overbroad and interfered with employee and union rights.

Court and Union filed (1) exceptions to the proposed ALJ decision, and (2) responses to the exceptions submitted by the other side.  In October 2014, PERB notified the parties that the filings were complete and the case had been placed on PERB's docket.

In February 2017, PERB issued Decision No. 2517-C.  PERB agreed with the proposed ALJ decision recommending that the prohibitions against wearing union regalia, displaying union writings or images, and distributing union literature during nonworking time in nonworking areas violated the Trial Court Act.  Contrary to the proposed ALJ decision's recommendation, PERB concluded the rule prohibiting soliciting during "working hours" violated the Trial Court Act because the term "working

8.

hours" was ambiguous and could improperly limit the exercise of rights during an employee's nonduty periods.

PERB ordered Court to remedy the violations by ceasing (1) to interfere with employees' rights to communicate with each other in the workplace and (2) to deny Union the right to represent its members. In addition, PERB ordered Court to rescind the portions of Personnel Rules 1.11 and 17.3 that violated the Trial Court Act and post notices of the PERB order in locations customarily used for employee notices.

### *Petition for Review*

In March 2017, Court filed a document with this court labeled "PETITION FOR WRIT OF REVIEW OF PUBLIC EMPLOYMENT RELATIONS BOARD DECISION." Section 71639.4, subdivision (a) authorizes persons aggrieved by a final decision of PERB to obtain judicial review of that decision by filing a "petition for a writ of extraordinary relief" with the court of appeal. Court's labeling of its writ petition has not created any disputes in this original proceeding and we have treated the petition as being subject to the procedures for a writ of extraordinary relief rather than the procedures specifically adapted to petitions for a writ of review.[4]

### DISCUSSION

As noted, this case concerns the effect of portions of two Personnel Rules adopted by Court, Rules 1.11 and 17.3. For purposes of efficiency, we consider first whether PERB correctly concluded these rules improperly interfered with employee activities and, only where we conclude the rules are flawed, second, PERB's authority to impose remedies for any violations. Ultimately, we conclude the Personnel Rules do not violate

---

[4]    A petition for a "writ of review" is the procedural device for obtaining judicial review of final decisions of the Agricultural Labor Relations Board, Alcoholic Beverage Appeals Board, Public Utilities Commission, and Workers' Compensation Appeals Board. (Lab. Code, § 1164.5, subd. (a); Bus. & Prof. Code, § 23090; Pub. Util. Code, § 1756; Lab. Code, § 5950; see generally, Code Civ. Proc., §§ 1067–1077 [writ of review].)

9.

the Trial Court Act, save for one provision that is ambiguous.  Before reaching the contested rules, we first identify our jurisdiction in these original proceedings and the relevant standards of review.

## *Jurisdiction, Legal Background, and Standard of Review*

Our jurisdiction in these original proceedings arises from the Trial Court Act.  The Trial Court Act is codified in chapter 7 of title 8 of the Government Code.  Article 3 of the Trial Court Act addresses labor relations between California's trial courts and court employees.  (§§ 71630–71639.5.)  One purposes of article 3 of the Trial Court Act is "to promote full communication between trial courts and their employees by providing a reasonable method for resolving disputes regarding wages, hours, and other terms and conditions of employment between trial courts and recognized employee organizations." (§ 71630, subd. (a).)  Others include "the improvement of personnel management and employer-employee relations within the trial courts in the state by providing a uniform basis for recognizing the right of trial court employees to join organizations of their own choice and to be represented by those organizations in their employment relations with trial courts" and requiring employees and trial courts "to meet and confer in good faith over matters within the scope of representation .…"  (*Ibid*.)

Section 71631 states that, unless provided otherwise, trial court employees have the right to participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations. Section 71635.1 states that trial courts shall not "interfere with" court employees because of their exercise of rights under section 71631.  Similarly, PERB Regulation 32606 states it is an unfair practice for a trial court to interfere with trial court employees because of their exercise of rights guaranteed by section 71631.  (Cal. Code Regs., tit. 8, § 32606 subd. (a).)  The phrase "interfere with" is the basis for the violations of the Trial Court Act found in this case.  In other words, PERB determined Court's implementation of

10.

Personnel Rules 1.11 and 17.3 interfered with the rights of Court's employees to participate in Union activities.

A complaint alleging any violation of article 3 of the Trial Court Act shall be processed by PERB as an unfair practice charge. (§ 71639.1, subd. (c).) "The initial determination as to whether the charge of unfair practice is justified and, if so, the appropriate remedy necessary to effectuate the purposes of [article 3 of the Trial Court Act], shall be a matter within the exclusive jurisdiction of [PERB]." (§ 71639.1, subd. (c).)

The Trial Court Act provides that "[a]ny charging party, respondent, or intervenor aggrieved by a final decision or order of [PERB] in an unfair practice case … may petition for a writ of extraordinary relief from that decision or order." (§ 71639.4, subd. (a).) Such a petition must be filed in the court of appeal, not in a superior court, within 30 days from the issuance of the final decision. (§ 71639.4, subd. (b).) The court of appeal has jurisdiction "to make and enter a decree [1] enforcing, [2] modifying, and enforcing as modified, or [3] setting aside in whole or in part the decision." (§ 71639.4, subd. (b).)

Subdivision (b) of section 71639.4 states that PERB's findings on "questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, shall be conclusive." In accordance with this provision, we apply the deferential substantial evidence standard of review to PERB's resolution of disputed factual questions. (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912 (*Boling*).)

Our review with respect to questions of law is de novo. However, when the question of law involves the interpretation of labor law provisions within the jurisdiction of PERB, courts usually defer to PERB's construction. (*County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 922 (*County of Los Angeles*).) Accordingly, we accept PERB's interpretation of the Trial Court Act "unless

11.

it is clearly erroneous." (*Ibid*.) Where the language of article 3 of the Trial Court Act is "the same or substantially the same" as that of the Meyers-Milias-Brown Act (§§ 3500–3511), which governs the labor-management relations in other public employment settings, the Legislature has directed that the provisions of the Trial Court Act be "interpreted and applied in accordance with the judicial interpretations" of the language of that act. (§ 71639.3.) Also, the interpretation of the Trial Court Act should take into consideration well-settled principles from PERB decisions, well-settled principles from decisions issued by the National Labor Relations Board (NLRB), and decisions by federal courts enforcing NLRB decisions. (See *County of Los Angeles, supra*, 56 Cal.4th at pp. 917–922.)

### *Personnel Rule 1.11*

Personnel Rule 1.11 imposes restrictions on the nature and types of clothing Court's employees may wear. The provision was specifically challenged under the allegation that it improperly infringed upon employees' rights to wear union regalia at the workplace. We will therefore generally refer to it as a restriction on union regalia. However, we note specifically that the provision does not single out union regalia and, instead, is a broad prohibition on a wide variety of clothing that includes other insignia and symbols.

In this instance, PERB, focusing on the union aspects of the issue, determined it "has long held that wearing union clothing, buttons or pins in the workplace is protected absent special circumstances." (See *East Whittier School District* (2004) PERB Dec. No. 1727, p. 9 [29 PERC ¶ 40, p. 9] (*East Whittier School District)* [simple rule is that wearing union buttons is a protected right, absent special circumstances].) It rejected Court's argument that special circumstances existed because of its responsibility to provide both the appearance and the fact of impartiality and neutrality. Addressing this argument, PERB determined "Court put on insufficient evidence to support a finding of special circumstances and it cannot categorically ban all display of union logos or

regalia." As a result, PERB concluded the rules prohibiting employees from wearing union regalia anywhere in the courthouse were overly broad and interfered with rights protected by the Trial Court Act.

*Relevant Legal Principles*

Under state and federal law, employees have the right to wear union buttons and other regalia in the workplace. (*East Whittier School District*, *supra*, PERB Dec. No. 1727, p. 9 [29 PERC ¶ 40, p. 9].) This general rule is subject to an exception where special circumstances justify a prohibition of union buttons and regalia. (*Ibid.*; *Pay'N Save Corp. v. N.L.R.B.* (9th Cir. 1981) 641 F.2d 697, 700. (*Pay'N Save).*) The special circumstances exception covers a variety of concerns and includes where the employer has "a need 'to project a certain type of image to the public.' " (*Pay'N Save*, *supra*, at p. 700, quoting *N.L.R.B. v. Harrah's Club* (9th Cir. 1964) 337 F.2d 177, 180.)[5] Generally, the employer has the burden of establishing that its policy or rule is justified by special circumstances. (*Pay'N Save*, *supra*, at p. 702; *Pathmark Stores, Inc.* (2004) 342 NLRB 378, 379, 380; see *East Whittier School District*, *supra*, PERB Dec. No. 1727, p. 11 [29 PERC ¶ 40, p. 11] [employer's "burden is simply to demonstrate that a special circumstance exists"].) This analysis is done through a case-by-case approach that considers the particulars of the employer's operations, including how employees interact

---

[5] The parties acknowledge that decisions by federal courts, the NRLB and PERB have recognized that an employer's public image *might* constitute special circumstances that justify restrictions on wearing union regalia. For instance, some NLRB decisions have struck down a private employer's prohibition on the wearing of union regalia on the ground the employer failed to demonstrate special circumstances. (E.g., *Pacific Bell Telephone Company* (2015) 362 NLRB No. 105, p. 5; *Nordstrom, Inc.* (1982) 264 NLRB 698, 702 [department store violated National Labor Relations Act (NLRA) by forbidding salesperson from wearing a small, tasteful and inconspicuous union button].) Other NRLB decisions have concluded the private employer carried its burden and demonstrated special circumstances. (E.g., *Starwood Hotels & Resorts Worldwide, Inc.* (2006) 348 NLRB 372, 373 [rule prohibiting hotel employees from wearing pins in public areas of hotel was justified by special circumstances].)

with the public. (See, e.g., *Beth Israel Hospital v. N.L.R.B.* (1978) 437 U.S. 483, 506 (*Beth Israel Hospital)* [the hospital context is quite different from retail marketing and restaurants].)

PERB has recognized that the existence of special circumstances depends on the setting and it has adopted a balancing test for determining whether special circumstances exist where the rights of employees are weighed against the legitimate interests identified by the employer. (*East Whittier School District*, *supra*, PERB Dec. No. 1727, p. 10 [29 PERC ¶ 40, p. 10] ["what constitutes a 'special circumstance' necessarily involves a balancing of various interests"].) This approach is consistent with federal decisions. (See *In-N-Out Burger, Incorporated v. N.L.R.B.* (5th Cir. 2018) 894 F.3d 707, 715 (*In-N-Out Burger*) [special circumstances exception reflects a balancing of employee's rights under the NLRA and the employer's management interests].)

*Court's Interest in an Impartial Judiciary as a Special Circumstance*

The issues raised with respect to Personnel Rule 1.11 present the novel question of whether a trial court's interest in the appearance of impartiality constitutes "special circumstances" that justify a rule prohibiting employees from wearing union buttons, pins and insignia. No published California judicial decision or federal court decision applying the NLRA (29 U.S.C. § 151 et seq.) has addressed the question. Similarly, we have found no final decision of PERB or the NLRB that has decided the issue.

The Law Recognizes the Importance of the Court Appearing Impartial

The importance of a judiciary that is independent and unbiased in fact, as well as in appearance, cannot be overstated. As recounted in various differing contexts, "justice must satisfy the appearance of justice." (See *Offutt v. United States* (1954) 348 U.S. 11, 14.) The need to maintain a neutral appearance on behalf of the judicial system is a paramount concern, as the "legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship." (*Mistretta v. United States* (1989) 488

14.

U.S. 361, 407.)  This concern extends throughout the judicial system:  "Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair."  (*Cox v. Louisiana* (1965) 379 U.S. 559, 562 (*Cox*).)

This concern about preserving the appearance of impartiality extends as far as public actions near a courthouse.  In *Cox*, the core issue was not the risk of actual bias in the judicial system, but the risk of apparent bias brought on by public actions around the courthouse.  That case involved regulations restricting picketing and demonstrating near the courthouse.  The regulations were upheld, in part because there could "be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create."  (*Cox*, *supra*, 379 U.S. at p. 562.)  Indeed, the United States Supreme Court confirmed "that the unhindered and untrammeled functioning of our courts is a part of the very foundation of our constitutional democracy" and that "[a] State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence."  (*Ibid.*)

To further solidify the underpinnings of its reasoning, the opinion provides an example of how public-facing actions may affect the appearance of impartiality courts must uphold and, thus, why laws "may also properly protect the judicial process from being misjudged in the minds of the public."  (*Cox*, *supra*, 379 U.S. at p. 565.)  As the court wrote:  "Suppose demonstrators paraded and picketed for weeks with signs asking that indictments be dismissed, and that a judge, completely uninfluenced by these demonstrations, dismissed the indictments.  A State may protect against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process."  (*Ibid.*)  In this way, actions taken on or around the courthouse are tied

not with the actual effect on judicial decisionmaking, but with the possibility the public may view those actions as affecting the process.

Court Has a Strong Interest that Employees Also Appear Impartial

Having confirmed that public actions around a courthouse can affect public perception, we note that public actions taken by court employees fall within an equivalent ambit. Indeed, such actions may be more concerning in the public's mind given the reasonable belief that actions taken by government employees in their official capacity reflect, in some manner, official government policy. For such reasons, in cases involving situations where the courts are regulating the speech of their employees, the law recognizes that "even many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees." (*Waters v. Churchill* (1994) 511 U.S. 661, 672 (*Waters*).) Thus, even "something as close to the core of the First Amendment as participation in political campaigns may be prohibited to government employees" and not only may those restrictions employ language more vague than permitted in restricting public speech but the government's predictions of harm are given more deference than when raised in individual speech situations. (*Id.* at pp. 672–673.)

The extra deference afforded the government in such situations arises "from the nature of the government's mission as employer." (*Waters*, *supra*, 511 U.S. at p. 674.) In the context of Court's duty to provide both actual and apparent impartiality, the difficulty of maintaining the public's perception of impartiality may be better understood through the analogy of judge as umpire, merely calling balls and strikes. In such contexts, the actual impartiality of the judge turns on the judge's potential conflicts. But in sports, as in the public sphere, a different concern is also well understood, often referred to as home-field advantage. In sports, it is unsurprising to hear fans of losing teams complaining the umpires were biased not based on any specific conflicts, but

16.

because they were influenced by the home field. The complaint essentially alleges that pressure from the surrounding crowd—their cheering and public displays of support for the home team as well as their expectations at the time of important calls—pushes the umpire to be friendlier to the home team than the visitor. The public may not believe the umpire is biased-in-fact, but they question whether fair calls are made in critical moments. The concerns thus parallel the notion in *Cox* that outside influence may skew the public's perception of a judicial ruling.

This case requires us to consider whether public displays of support for various causes, including union views, are sufficiently concerning to justify courts in limiting the ability of court system employees to display those views to the public while at work. On a general level, the answer appears a clear yes. Indeed, a simple modification of the analogy in *Cox* shows the potential influence such actions may have. Consider the situation where a dispositive motion has been filed against a group opposing unionization of some industry. Now suppose the file clerks of the court where that motion was filed wore pro-union regalia each day the opponent of that motion arrived to file paperwork, attend the hearing, or otherwise go about the business of defending against the motion, and that the judge, completely uninfluenced by that regalia, granted the motion, thereby dismissing the action. As in *Cox*, Court should be permitted to protect against the possibility of a conclusion by the opponent that the judge's action was in part a product of their relationship with their staff and did not flow only from the fair and orderly working of the judicial process.

The argument for preventing such potential perceptions is much stronger in our situation—where the very employees the judge relies upon to ensure the court functions efficiently and whom the judge sees on a daily basis inside of the courthouse provide the apparent pressure—than in a situation such as that envisioned in *Cox* where the general public, who may not even have the power to remove the judge from office, demonstrate outside the courthouse. While the public may have concerns that broad support for a

17.

cause may sway a judge, there can be no doubt that such concerns would magnify were the pressure not brought through broad protests outside the courthouse, but rather through attempts at influence on a daily basis inside the judge's chambers.

Court employees dedicate themselves to the cause of justice and are invaluable to the court's ability to function. Their dedication and hard work, however, place them in situations the public may reasonably understand as within the sphere of judicial influence. To protect the institution that is the judicial branch, employment rules designed to minimize or eliminate the potential for public concern about impartiality based on views held by those employees is a reasonable protective step. While this case is discussed mostly in the context of union views, the courts see a nearly infinite variety of cases, any one of which may involve situations where employee support of seemingly benign positions may raise concerns with one or another litigant. Thus, the restrictions may need to cover sports teams, advocacy groups, charities, and many other groups. That union positions may fall within the scope of these restrictions does not raise any concerns greater than those already recognized.

PERB's Decision Is Contrary to Established Precedent and Clearly Erroneous

While we broadly conclude the workplace rules in this case are consistent with the state of the law, we recognize that our review is narrower than simply concluding the law supports Court's action. Rather, we must consider whether PERB's conclusion that the workplace regulations cannot stand is contrary to established PERB precedent or clearly erroneous. (*County of Los Angeles, supra,* 56 Cal.4th at p. 922; *California State Employees' Assn. v. Public Employment Relations Bd.* (1996) 51 Cal.App.4th 923, 929, 933.) As noted above, both sides recognize the exact issue raised in this case is one of first impression. Court, however, argues that prior holdings relevant to patient care show that PERB precedent recognizes and accepts the need to limit union and other similar speech in certain contexts. Specifically, pointing to *The Regents of the University of*

18.

*California, University of California at Los Angeles Medical Center* (1983) PERB Decision No. 329-H [7 PERC ¶ 14214] (*UCLA*), Court contends that PERB has expressly adopted the view expressed in *Beth Israel Hospital*, that employee and employer rights must be balanced based on the context of the particular industry at issue. Court then argues that PERB's decision, in this case, to consider effects that would cause a judge to potentially recuse him or herself was unduly narrow in light of that precedent.

We agree. Although dealing with nonemployee organizer access to hospital areas, the analysis undertaken by PERB in *UCLA* is instructive. There, after rejecting the claim that nonemployee organizers should be treated differently than employee organizers because the public was regularly permitted access to the areas in question, PERB undertook to determine whether UCLA had demonstrated that permitting organizers into various portions of the hospital would materially affect patient care. (*UCLA*, *supra*, PERB Dec. No. 329-H, pp. 8–10 [7 PERC ¶ 14214, pp. 8–10].) The analysis ultimately turned on whether an area was properly categorized as a patient care area. If the area in question was utilized for providing medical care or transporting patients between treatment areas, PERB recognized that regulating union activities in those areas would be presumptively valid owing to the need to ensure proper patient care. (*Id.* at pp. 10–11.) However, the same regulations would be presumptively invalid in areas that could be effectively sealed off from patients, their family, and friends and were not routinely used or entered by them—such as employee lounges, locker rooms, and classrooms. (*Id.* at p. 11.) PERB further noted, too, that the access in question did not extend to unauthorized access to union employees in corridors, at nursing stations, or during times when employees were on duty, all concerns raised by UCLA about how the permitted access may affect patient care. (*Id.* at p. 14.) The overall analysis, then, was one that considered the proven purpose of the space, the risk of harm to that purpose, and the evidence demonstrating contested areas fell, or did not fall, within those spaces where harm would exist from union activities.

19.

PERB contends it satisfied this level of analysis. It asserts Court's complaints are little more than a claim that Court's special purpose as an impartial decisionmaking body entitles it to a presumption that its regulations are permissible. PERB argues this is not the case, and that its analysis merely applied its general rules to Court as if it were any other employer. We agree with PERB that, to the extent it reviews Court's conduct as an employer, it should treat Court as any other employer and, thus, that overbroad regulations are presumed invalid. However, this agreement does not aid PERB in this matter. Its error comes from an incorrect application of the facts to the principles generally applied in these situations and not from the conclusion that Court is not entitled to a presumption of validity.

The facts developed at the administrative proceedings demonstrate that the regulations at issue are generally designed to protect Court when employees interact with the public. Accordingly, in these proceedings Court has justified its restrictions based on claims, *a priori* legitimate as exemplified in the case law discussed above, that public perception may be affected by persistent and identifiable pressure on the decisionmaking process. It further presented evidence regarding the way employees interact with the public as part of their job duties and the nature of the largest courthouses covered by the contested policies, areas covering the vast majority of the affected workers.

It also presented evidence supporting the strength of its interest in protecting against the appearance of partiality, including evidence in the form of the Code of Ethics and guidelines adopted by the Judicial Council, a constitutionally created organization. The Code of Ethics was prepared for employees and excludes judges.[6] It explicitly

---

[6] A Code of *Judicial* Ethics was adopted by the California Supreme Court in 1996. It was the result of Proposition 190, which amended the California Constitution to require the Supreme Court to make rules for the conduct of judges and to refer to such rules as the "Code of Judicial Ethics." (Cal. Const., art. VI, § 18, subd. (m); see generally, Robie et al., *California Judicial Council's "Commission for Impartial Courts"* (2010) 42 McGeorge L.Rev. 135.)

20.

addresses the need for employees of California's trial courts to present the appearance of impartiality.

The weight of this evidence in the analysis is substantial. A trial court's appearance of impartiality is significant because Court performs a unique governmental function—namely, the administration of justice. Trial courts perform this function for all of California's citizens and may not discriminate among them.[7] Maintaining the appearance of impartiality is important to promoting the public's confidence in the administration of justice, which includes the accurate and timely handling of papers submitted to the court and providing accurate information about court processes to members of the public. Thus, for instance, the seventh tenet of the Code of Ethics directs employees to "[s]erve the public by providing accurate information about court processes that is as helpful as possible without taking one side over the other, or appearing to favor one side of a case." This tenant necessarily implies that it is possible for court employees to favor one side of a case when providing information to litigants and doing so would affect the way the court is perceived.

Consequently, based on a trial court's unique role in administering justice, we conclude that appearing to perform this function impartially constitutes a substantial, legitimate interest. We further conclude that a trial court's interest in appearing impartial constitutes special circumstances justifying restrictions on clothing and adornments worn by Court's employees.

Under PERB's precedent then, as employed in *UCLA*, the relevant dispute to resolve should have centered on whether the areas affected were, in fact, areas where

---

[7] The guideline to the tenth tenet of the Code of Ethics states that "[e]qual access to the court system and equal treatment for all are the cornerstones of the administration of justice." The individuals who come before trial courts have a wide range of characteristics, which the tenth and eleventh tenets in the Code of Ethics list as including race, religion, color, national origin, ancestry, physical or mental disability, medical condition, marital status, sex, age, and sexual orientation.

21.

public displays of support for causes would affect the appearance of impartial justice. The underlying decision did not engage in this inquiry. Rather, PERB looked for examples of past incidents concerning the display of union views to determine whether Court's underlying interest in regulating public spaces was legitimate. While such an inquiry may provide valuable information, its use in this instance to overcome the legitimate concerns inherent in Court's position, and recognized in the case law, was clearly erroneous. In *UCLA*, specific allegations of harm to patient care were made but were readily overlooked by PERB on the ground "such incidents [are] not probative as to whether the limited grant of access herein would cause disruption of patients or patient care" when they do not relate to the access in question. (*UCLA, supra*, PERB Dec. No. 329-H, p. 14 [7 PERC ¶ 14214, p. 14].) The same is true of the allegation there were no prior issues recorded. Whether Court maintained records of discipline or complaints regarding union regalia does not disprove the possibility that members of the public attending the courthouse did not feel concern about the impartiality of Court based on employee actions. Indeed, the record reflects that the potential for such concerns is particularly high at a courthouse, as at least some testimony showed that even irrational concerns about a mediator's gender were grounds for complaints.

By focusing on the lack of prior incidents, and the belief that employee conduct would not force a judge to recuse him or herself from a particular matter, as reasons to discount Court's legitimate concerns about the public perception of Court, PERB granted Court's impartiality concerns less legitimacy than was granted to UCLA's concerns about harm to patient care. Given that the case law demonstrates that the government as employer is entitled to rights similar to private employers, and much greater than granted the government when not acting as employer, rejecting Court's legitimate concerns regarding impartiality on lesser evidence than that supporting the actions of healthcare employers was clearly erroneous. The risk of potential harm to the purpose of the utilized space was at least as strong as that provided in UCLA and, as such, the proper

22.

areas of dispute concerned not whether Court could legitimately restrict employee speech—as it certainly can in this instance—but whether the specific regulations enacted were overly broad or the areas in which speech was restricted were appropriately identified. We thus conclude PERB erred in affirming the underlying determination that Court's restrictions on employee clothing were not supported by the record or the case law.

### Court's Interest in Impartiality Justifies the Breadth of the Rule

Personnel Rule 1.11 broadly precludes employees from wearing any insignia or regalia in the workspace generally, along with limiting clothing options to business appropriate attire. While there is no reasonable challenge to raise regarding the broad restriction to business appropriate attire, it has been argued that a total ban on insignia or regalia is overbroad, particularly with respect to union views. We do not agree.

The record in this case is replete with evidence that most, if not all, employees of Court will encounter or have a high likelihood of eventually encountering members of the public in their daily activities. While there are likely some positions that do not necessarily encounter the public, the open space nature of courthouses and the vast majority of the evidence shows that public encounters are neither infrequent nor unexpected. When coupled with the undeniably important interest Court has in ensuring the public is not presented with situations where Court's impartiality could be reasonably questioned due to employee viewpoints, we believe the use of a broad ban on insignia and regalia in the workplace generally is appropriate in this instance. Specifically, we conclude that the broad ban adopted by Court is proper in this case based on the evidence of public contact for virtually all affected employees and the evidence showing broad public access to certain courthouses. We recognize that under different facts narrower scopes to regalia restrictions may be required.

We thus reject the argument that a narrower policy could be adopted whereby each judge determines what will be permitted in his or her courtroom. Initially, such a policy does not resolve the legitimate concerns Court has about employee interactions with the public outside of courtrooms. But, more fundamentally, such a policy would be unworkable. The largest courthouse in this case has seven floors and can have upward of two dozen judges working there. Employees, such as court reporters and clerks, regularly move between courtrooms and amongst the many floors. A judge-by-judge courtroom rule would require employees to predict not only their movements but the movements of those judges they are likely to encounter while entering courtrooms and traveling throughout the building. Although, in oral argument, Union's counsel expected that Union's members would be aware of individual practices and to try to enter courtrooms with those practices in mind, counsel acknowledged a hodgepodge of individual judicial expectations would be problematic because discipline of employees cannot occur unless those employees have a clear understanding of what is expected of them.

As a practical matter, then, any rule or set of rules adopted by individual judges with respect solely to their courtrooms will be applicable to only some employees and only some of the time. Yet legitimate concerns arise even in that narrow context with employees transferring between multiple courtrooms. Should, for example, a major environmental case be occurring in courtroom A, where environmentally sensitive messages are being banned by that court's judge, such individual rules would not prevent an employee in courtroom B from wearing a "Drill Baby Drill" or "Save the Whales" message while walking to their assignment, even though their route would take them past and through those litigants when walking to and entering courtroom B. And it might not prevent clerks at filing stations or other judge's secretaries and assistants from wearing similar messages. Moreover, given that court reporters and clerks can regularly change courtrooms throughout the day, it is reasonable to conclude that it is likely a situation may arise where the employee in courtroom B is called to assist in courtroom A, and thus

24.

encounters and potentially influences the views of exactly those litigants the judge in courtroom A sought to protect.

Finally, Court's concerns are not undercut by the fact this dispute arises in the context of a dispute about its employees' right to wear small items, such as pins and lanyards, related to Union. While it is argued an innocuous pin or lanyard showing union status could not affect the public's perception of Court, accepting such a view only sidesteps the underlying issues raised by the realities of the courthouse. A wide array of interested parties bring their disputes before Court. These include numerous business disputes between employers and employees having no direct relation to Union but raising issues upon which unions commonly take positions. Whether a message seen by these parties is conveyed through the smallest pin or lanyard or the brightest shirt, the fact of union influence in the courthouse may be seen as an indication of partiality by business litigants even in cases where Union is not involved. The pin or lanyard presents a message that a variety of litigants could reasonably view as contrary to their interests, regardless of the benign intent of the person wearing the pin or lanyard or Union's actual views. It is for precisely these practical reasons that, under the unique situation presented in this case, a broadly framed workplace-wide restriction is both the most practical and the most appropriate way to protect Court's legitimate interest in ensuring an appearance of impartiality throughout the courthouse.

It is on this analysis of the proper breadth where we garner a dissent. We feel a response is appropriate, as the dissent relies upon a misreading of our opinion to support a legally flawed analysis. To suggest our analysis relies upon a conclusion that members of the public believe the employees of the court system cannot act ethically or that judges are willing to abandon their ethical responsibilities at the slightest of pressures seriously calls into question the dissent's entire position.

The issue before us is the public perception of the courts. Most of the public interact with the court only when necessary and, often, not because they choose to. We

do not think, nor do does our opinion maintain, that the public believes Court staff is biased. But we have no doubt that public perception can be swayed. Our analysis does not turn on whether the public has concluded one employee, or one judge, was actually biased. Indeed, if we had even come remotely close to suggesting that these rules were appropriate because court employees cannot act ethically, we would definitely have our own concerns about the conclusion.

The rules and regulations for actual bias situations are quite strict, clear, and not implicated here. Rather, the issue is institutional in nature. Can a court protect against the perception of bias in the public sphere? Can it manage its employees in a way that definitively excludes the possibility that some portion of the litigants going before it see messages from the court through its staff that directly or indirectly oppose the positions they are taking in their own pending litigation? Does Court's legitimate interest in protecting the perception of the court justify a broad ban in this particular case at this particular court? The answer, as we explained above, is yes. Accordingly, we are not, as suggested, protecting partisan elements with strong anti-union views. Such views have absolutely nothing to do with this case. Rather, we are protecting the public's right, in each individual case, to perceive Court as impartial.

The dissent has unfortunately chosen to recast our views in actual bias terms. In doing so and in then calling for concrete examples of public complaints of bias the dissent exposes a more fundamental difference in viewpoints. Where the dissent would require cracks in the foundation of the public's trust in the court system before permitting repairs, we believe it is more important, and legally permissible, to proactively protect the public's trust in the court system before they have a real reason to doubt the institutions they trust to govern their disputes.

Nor would we expect such fundamental concerns to ever be resolved through bargaining processes, as the dissent states. Bedrock principles such as maintaining the

integrity of the courts and keeping them free from the perception of bias are not bargaining issues equivalent to the length of, or location for, rest breaks.

The dissent argues that our concern with union regalia must be that it does something more than inform the public that the employee is a union member. It goes so far as arguing that a small metal union pin communicates little except that the wearer is a proud Union member. But wearing a union pin, shirt, or lanyard, does not simply signify membership in a union. Unions are representative of a known viewpoint, one favoring the interests of employees. They were created to counterbalance corporate interests. Wearing such union regalia may signify union membership to a union member, but it also invariably presents a broader message. It is not unlike seeing a member of the NRA or ACLU wearing a membership pin. The public association with such organizations readily invokes their core messages (protecting the Second Amendment or protecting civil liberties) and reminds the public that those institutions regularly fight for those rights.

General rights laid out in the Trial Court Act or Court's own employment documents do not trump Court's broad and legitimate concerns about appearing impartial. The public's right to perceive an impartial judiciary affects views much broader than those of Union members. Accordingly, we do not agree with the dissent that our analysis must narrowly focus on Union issues. Rather, it is important to take a wider view and to consider how the law views more fundamental Constitutional rights in analogous contexts. Failing to consider and analogize to these broader rights works only to avoid the actual weight of Court's interest in the balancing test. Moreover, to the extent Union may claim member's free speech rights are a component of their employment conditions, such broader views may become the subject of future disputes which could involve buttons, pins, or shirts evidencing support for other political issues of concern to Union. This is a slippery slope that cannot be so easily characterized as simply involving a membership pin.

The dissent itself acknowledges that Court's interest in avoiding a perception of bias is a fundamental and strong concern, worthy of weight in the ultimate balance. But by sidestepping the full scope of that interest, the dissent treats this foundational interest as no different than In-N-Out's interest in not upsetting its unique public image. (See *In-N-Out Burger, supra,* 894 F.3dat pp. 715–716.) While both certainly have unique public images, Court's image is definitely not the same as In-N-Out's. There can be no dispute that a distinct difference exists between a burger chain and the judicial branch.

To bolster its positioning, the dissent attempts various factual, legal, and logical arguments. Each is flawed. Factually, the dissent claims that the number of union, or even employment cases before Court are minimal in comparison to the overall docket. It notes specifically that only three union cases and only 140 employment cases were identified in the record. It contextualizes the relative importance such cases have within the more than 237,000 total case filings it found online, noting specifically that the business cases account for less than one-half percent of Court's civil filings. We must ask: Relative importance? The implication, which must be made explicit, is that some cases are so insignificant to the dissent that it believes we should tolerate a court system where some small percentage of cases are subject to a perception of bias. Simply stating the premise disproves it, as it is fundamental to an impartial judiciary that each case and each litigant is treated equally and fairly before the law.

Legally, the dissent attempts to contort the standard of review, treating PERB's weighing of Court's special circumstances and Union's rights under the relevant statutes as a factual dispute in order to allow it to further defer to PERB's analysis. The dissent takes this position too far. As the dissent's own citation and our discussion of relevant legal principles explain, on matters of law within an agency's scope of authority, we apply a hybrid approach, following PERB's interpretations unless clearly erroneous. We retain "final authority to ' "state the true meaning of the statute" ' " and thus maintain our interpretative authority while acknowledging the agency's administrative expertise.

28.

(*Boling, supra,* 5 Cal.5th at pp. 911–912.)  It is simply wrong to treat overbreadth issues as ultimate factual determinations.  Rather, as we have done, we must consider whether PERB's legal balancing is clearly erroneous.  We conclude it was.

Logically, the dissent argues that Court's employees should be held to the same standard as judges and that it would be a mistake to hold judges to a lower standard than employees.  But this, too, does not survive close scrutiny.  Judges and Court's staff have different ethical duties and different job duties.  In many if not all ways, judges, accountable to the public and either elected by them or appointed by their representatives, are held to higher standards than Court's employees.  While the dissent tries to minimize this particular case by making it about wearing small union buttons at the courthouse, its own use of judicial canons would not only exclude the same buttons it tries to protect (Could one even imagine a judge coming to work and wearing a pro- or anti-union button in the courthouse while presiding over a union case?) but would also go further to prevent the presentation of similar messages outside of the courthouse (as the display of political yard signs by judges is equally prohibited).  (See, e.g., Rothman et al., Cal. Judicial Conduct Handbook (4th ed. 2017) §§ 5:31, p 299 ["Comment on a case pending before the judge or on appeal could affect the outcome in the case and display bias.  The judge's need to comment is not as important as the need to maintain the appearance of fairness and impartiality during the pendency of proceedings."]; 11:33 pp. 753–754 ["A family member should be strongly dissuaded from placing a lawn sign in front of the family home or a bumper sticker on the family car in support of a nonjudicial candidate.  Such displays of support for a nonjudicial candidate, even if the judge is not a party to the decision, injure the perception of judicial impartiality."]; see also Cal. Judges Assn., Formal Ethics Opn. No. 49.)

No rational analysis would suggest Court's employees be held to judicial standards.  And, equally importantly, no rational analysis would suggest that the judicial cannon's interpretation of impartiality, focused as it is on decisionmakers, covers the full

29.

breadth of the meaning of that term. Yet, inexplicably, the dissent would, deferring to PERB's analysis, import these inapplicable standards to govern courthouse employee conduct.

The dissent makes several other wrong turns in its analysis, at each interval seeming to conflate concerns about actual bias with what this dispute is really about, protecting Court's recognized right to ensure it appears impartial in its dealings with the public. These errors are highlighted in the dissent's footnoted remark that "the appearance of impartiality is not the be all, end all of the judicial system." This conclusion shows the dissent's fundamental error. In fact, the appearance of impartiality is a critical component of the judiciary. The dissent cannot fairly, on the one hand, agree that Court has a legitimate interest in appearing impartial to the public while, on the other hand, baselessly rejecting this right. It errs further by relying on inapplicable arguments concerning limits to this general interest or unsubstantiated claims that any actual offense that may be taken is the result of a partisan litigant's emotional involvement in the case.

To avoid acknowledging that Court's interest in impartiality outweighs the disputed rights in the Trial Court Act, the dissent utilizes several conflicting approaches. In some instances it defers to PERB's views, for example that the ethical rules applicable to judges should control or that the balancing analysis is a factual matter. In others, it simply recasts the actual disputes to argue there is no evidence the disputed conduct will create actual bias. This results in difficult practical problems. Namely, the dissent would have disputes concerning how much influence union activity had on the public's perception of the court be determined on a case by case basis—where obvious views would be prohibited but muted views would not, or small pins would be acceptable but large ones would not. As we noted above, this is simply unworkable and, worse, unfair to both employees and the courts they work for. To have a standard that requires one to remember to keep their mouse pad properly covered when in view of the public or proactively determine whether their shirt is too bright, too bold, or utilizes too large of a

font to be worn at work only invites the extremes of boundary pushing or self-censorship, and ultimately numerous future disputes; all of which the dissent itself acknowledges can cause the public to lose faith in the court system if taken too far. No rightminded employer would seek such a solution and the law should not be twisted to force Court into such an untenable position. Far from the dissent's puzzling claim, recognizing this fact is absolutely not an affront to Union employees.

Our analysis provides the most practical solution and rests on the soundest legal principles. It is unfair to force Court's employees into proactively guessing whether their smaller or duller regalia will cross the case-by-case line suggested by the dissent. We look at such a solution and see no practical way for Union and Court to agree to a uniform rule. While we would like to see what our colleague believes is a proper balance between the right to express muted views and the right to exclude loud ones, we note the dissent does not provide any suggestions or solutions. Ultimately, we believe this is because the facts, the law, and logic all show there is no such practicable or workable solution.

### *Personnel Rule 17.3*

Personnel Rule 17.3 sets forth the rules that apply to employee activity on Court's property involving: (1) solicitation during working hours; (2) distribution of literature in working areas; and (3) the display of writings or images in work areas that are visible to the public. PERB determined the restriction on soliciting during work hours was overbroad. It determined the restriction on distributing literature in working areas was ambiguous. And it determined the restriction on displaying images in public areas was overbroad. We consider each conclusion separately.

*The Solicitation During Working Hours Rule Is Not Ambiguous*

This dispute concerns portions of Personnel Rules 17.3.1 and 17.3.2. As noted above, the first paragraph of Rule 17.3.1. provides employees may not solicit during

*working hours* for any purpose unless pre-approved by the [Court Executive Officer]. It then notes that *working time* is defined in the next section. Although related to a later argument, the second paragraph states "Employees of the Court may not distribute literature during working time for any purpose. Working time is defined in the following section." Rule 17.3.2 then defines working time as including "the working time of both the employee doing the soliciting and distributing and the employee to whom the soliciting is being directed. Working time does not include break periods, or any other specified periods during the workday when employees are properly not engaged in performing their work tasks."

The ALJ and PERB Decisions

Before the ALJ, Union argued the restriction on solicitation during "working hours" was overbroad because "working hours" was not defined by the Personnel Rules and could be read to mean the operating hours of Court. The ALJ's proposed decision addressed the argument that "working hours" was ambiguous by stating "a reasonable interpretation of [Rule] 17.3.1 leads to the conclusion that 'working hours' is meant to be synonymous with 'working time,' since the sentence defining 'working time' immediately follows the sentence prohibiting solicitation during 'working hours.' " The proposed decision concluded the term was not ambiguous and did not interfere with employee rights. As a result, the proposed decision concluded the restriction on employee solicitations during working hours was lawful.

PERB disagreed. PERB (1) quoted the basic principle that working time is for work, (2) stated employers may prohibit solicitations during working time, and (3) interpreted the term "working hours" to include duty-free periods, such as meal and rest breaks. PERB's decision then stated: "An employer rule that prohibits solicitation or distribution during working hours, but makes no mention of duty-free times during 'working hours,' such as meal or rest periods, when employees may solicit one another or

distribute literature, may reasonably be interpreted as authoring no such activities during those duty-free periods of the day. [Citation.] [¶] Such is the case here." The decision stated Court "chose to introduce a separate and undefined term 'working hours,' which our precedents recognize as ambiguous and overly broad. (*San Ramon* [*Valley Unified School District* (1982)] PERB Dec. No. 230, pp. 11–12.)"**8** Based on its textual analysis, PERB held Court's rule addressing solicitations was overly broad and interfered with rights protected by the Trial Court Act.**9**

Applicable Law and Standard of Review

The parties do not dispute the basic principles that apply to employer rules that prohibit employees from soliciting while on the job. In 1945, the United States Supreme Court quoted with approval an NLRB decision setting forth these principles:

> " 'The [federal statute], of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during *working hours*. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose. It is no less true that time outside *working hours*, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, although the employee is

---

**8** The cited decision addressed the access of a union representative to a faculty lounge during the lunch period and set forth the following principle: "Essex International, Inc. (1979) 211 NLRB 749 [86 LRRM 1411] established that rules which prohibit solicitation during 'working hours' (which would include lunch and breaks) unduly restrict employees' right to engage in protected activities since the employer has no cognizable interest in prohibiting nondisruptive contact in nonworking areas between employees and their organizations during duty-free periods of the day. [Fn. omitted.]" (*San Ramon Valley Unified School District* (1982) PERB Dec. No. 230, pp. 11–12 [6 PERC ¶ 13184, pp. 11–12].)

**9** PERB did not mention how the term "working hours" had been used in the NLRB decision quoted by the United States Supreme Court in *Republic Aviation Corp. v. N.L.R.B.* (1945) 324 U.S. 793, 803, fn. 10 (*Republic Aviation*)—specifically, that the term "working hours" had been used as a synonym of "working time."

on company property.  It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of *working hours*, although on company property.  Such a rule must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline.' " (*Republic Aviation*, *supra*, 324 U.S. at p 803, fn. 10, italics added.)

Language is "ambiguous" when it is susceptible to more than one reasonable interpretation.  (*Merced Irrigation Dist. v. Superior Court* (2017) 7 Cal.App.5th 916, 925 [statutory language] (*Merced Irrigation*); *Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 619 [contractual language] (*Adams*).)  Similarly, "[t]he common or ordinary definition of 'ambiguous' is 'capable of being understood in two or more possible senses or ways.' " (*Arnaudo Brothers, L.P. v. Agricultural Labor Relations Bd.* (2018) 22 Cal.App.5th 1213, 1231.)  A fundamental principle applied to the construction of statutes, regulations and rules is that the language is to be understood in context, with the whole of the enactment considered when attempting to construe each part.  (*Mendoza v. Nordstrom, Inc.* (2017) 2 Cal.5th 1074, 1087.)  Restated in the negative, an enactment's language is not construed in isolation.  (*Id*. at p. 1084; *Deal v. United States* (1993) 508 U.S. 129, 132 [it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"].)[10]  A second, related interpretive principle is that no part of an enactment should be rendered surplusage if a construction is available that avoids doing so.  (*Mendoza*, at p. 1087; *Moyer v.*

---

**10**     Similarly, language used in a judicial decision must be construed in the context of the entire opinion.  (*International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 276 [union's interpretation of a sentence from a California Supreme Court decision was plausible when viewed strictly as a matter of grammar, but was not supportable when the sentence was viewed in the context of the entire opinion].)

*Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [construction making some words surplusage is to be avoided].)

Questions involving the interpretation of statutory and regulatory provisions are regarded as legal questions. (*Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.* (2010) 190 Cal.App.4th 1502, 1521.) Similarly, the interpretation of municipal resolutions and civil service rules are questions of law. (*Nick v. City of Lake Forest* (2014) 232 Cal.App.4th 871, 880 [municipal resolution]; *American Federation of State etc. Employees v. County of Los Angeles* (1983) 146 Cal.App.3d 879, 884 [civil service rule].) Accordingly, we conclude the interpretation of Personnel Rules, like the interpretation of statutes, regulations, municipal resolutions and civil service rules, is a question of law. Whether the language of a personnel rule is ambiguous is a question of law subject to an independent determination by the courts. (See *Merced Irrigation*, *supra*, 7 Cal.App.5th at p. 925.) We note the same approach applies to contractual language—the existence of a contractual ambiguity poses a question of law subject to independent review. (*Adams*, *supra*, 224 Cal.App.4th at p. 619.) Therefore, we conclude PERB decided a question of law when it determined the provision prohibiting solicitations during working hours was ambiguous and review that decision de novo. (See *Boling*, *supra*, 5 Cal.5th at p. 911.)

Working Hours Is Not Ambiguous in Its Proper Context

PERB's conclusion that the rule restricting solicitations was ambiguous was erroneous because it overlooked its clear contextual meaning in the rule. PERB construed the term "working hours" in isolation, not in context, and its approach made surplusage of the second sentence of the first paragraph of Personnel Rule 17.3.1. The first sentence in the paragraph prohibited solicitations during "working hours." The second sentence stated, "Working time is defined in the following section." As the term "working time" is not used in the first sentence, the only way the second sentence would

serve any purpose is if the term "working time" and the term "working hours" used in the first sentence meant the same thing. Thus, PERB's determination that "working hours" could mean something other than "working time" deprived the second sentence of any meaning or purpose.

The principle that an enactment must be construed as a whole also requires the consideration of the use of the word "soliciting" in the definition of "working time." That definition states "[w]orking time includes the working time of both the employee doing the *soliciting* and distributing and the employee to whom the *soliciting* is being directed." (Italics added.) These two references to soliciting would serve no purpose if the definition of "working time" had no role in delineating the restriction on solicitations set forth in the first paragraph of Personnel Rule 17.3.1. The analysis adopted by PERB did not consider the use of the word "soliciting" in the definition of "working time" and how its use affected the reasonableness of interpreting "working hours" to mean something other than "working time."

Finally, Personnel Rule 17.3.1's use of the terms "working time" and "working hours" as synonyms is the same way those terms were used in an NLRB decision quoted by the United States Supreme Court. (*Republic Aviation*, *supra*, 324 U.S. at p. 803, fn. 10.) The use of the terms in *Republic Aviation* should be considered in evaluating the reasonableness of the interpretations advanced by the parties.

Our independent review of the provision restricting solicitation during "working hours" considers the provision in the overall context of Personnel Rule 17.3, avoids rendering other language surplusage and takes into consideration how the United States Supreme Court used the terms in *Republic Aviation*. This review leads us to conclude Personnel Rule 17.3.1's use of the term "working hours" is not ambiguous. Placed in context, it is reasonably susceptible to only one interpretation—namely, the ban on solicitation during "working hours" means employees may not engage in solicitation during "working time" but may engage in nondisruptive solicitation during nonworking

36.

time—that is, their duty-free periods. PERB's determination that "working hours" was ambiguous constitutes legal error and that portion of the PERB decision must be set aside. (See § 71639.4, subd. (b).)

*The Rule on Distribution of Literature in Working Areas Rule Is Ambiguous*

We next consider Court's restriction on the distribution of literature in working areas of Court. This dispute concerns the second and third paragraphs of Personnel Rule 17.3.1. These paragraphs provide that employees "may not distribute literature during working time for any purpose" and "may not distribute literature at any time for any purpose in working areas." The second paragraph's prohibition on distribution is limited to "working time." As a result, the practical reach of the third paragraph's "any time" prohibition is limited to distributions that occur during nonworking time. Those nonworking time distributions are barred "in working areas."

PERB determined the restriction on distributions "during working time for any purpose" was valid because it implements the basic principle that " '[w]orking time is for work.' " (*Republic Aviation*, *supra*, 324 U.S. at p. 803, fn. 10.) In contrast, PERB determined the ban on distributions "at any time for any purpose in working areas" was ambiguous and overly broad, which had the potential to discourage employees from engaging in protected activity in mixed-use areas during their nonduty time.

In particular, PERB noted that the term "working areas" was not defined and the Court had many areas, such as a file room, courtrooms and jury rooms, that (1) were used for Court's business some of the time and (2) at other times were not accessible to the public and were used by employees during their nonwork time. For instance, unused courtrooms and jury rooms are used by employees from various departments of Court during meal or rest breaks. PERB concluded the rule did not clearly state how the ban applied to these mixed-use areas because the combination of the phrases "at any time" and "in working areas" was reasonably susceptible to an interpretation banning

37.

distributions in such mixed-use areas when used by employees during their duty-free periods. PERB found this ambiguity would reasonably tend to limit the exercise of protected rights and, therefore, the ban violated the Trial Court Act.

Based on this ruling, we are faced with both procedural and substantive issues. Procedurally, Court argues that PERB lacked authority to determine whether the "working areas" language was ambiguous because this basis was not alleged in the complaint and was therefore barred by the unalleged violations doctrine. It contends that considering the issue constituted a "*per se* violation of due process" was erroneous. Court then substantively attacks PERB's ambiguity determination. It also argues, globally, that PERB lacks authority to force Court to change its rules under separation of powers concerns.

<u>The Unalleged Violations Doctrine Does Not Bar PERB's Authority</u>

Court contends PERB should not have considered the challenge to the rule banning distribution of literature during nonworking hours "in working areas" because that ground was not alleged in the complaint. Instead, the challenge was limited to nonworking areas. Furthermore, Court argues PERB's application of its " 'unalleged violations' doctrine" denied Court due process.

In response, PERB contends it correctly applied its long-standing test to determine whether the unalleged violations doctrine allowed consideration of an issue not specifically alleged in the complaint. PERB argues it thoroughly reviewed the record and accurately determined the issue had been fully litigated such that Court would suffer no prejudice if the issue was addressed.

### *Relevant Facts*

Typically, a union files a "charge" with PERB alleging an employer committed an unfair practice and, if the allegations are adequate, a complaint is issued by PERB's Office of General Counsel. PERB Regulation 32615 requires the charge to be in writing

38.

and to contain, among other things, a "clear and concise statement of the facts and conduct alleged to constitute an unfair practice." (Cal. Code Regs., tit. 8, § 32615 subd. (a)(5).)

Here, the charge filed by Union included an appendix containing numbered paragraphs that described the unfair practices alleged. Paragraph 7 of the appendix alleged "Court employees represented by [Union], have been entitled to distribute written materials or flyers in public, and non-working areas of the Court, on non-work time, insofar as said flyers are concerned with wages, hours, and terms and conditions of employment of Court employees." Paragraph 8 of the appendix alleged that during the period Union and its predecessor represented Court's employees, Union "has had the right to distribute leaflets or flyers in non-work areas, breakrooms, and public areas, of the Court building insofar as said flyers related to the wages, hours, and terms and conditions of employment of Court employees and ha[s] exercised that right." Paragraph 11 of the appendix alleged that while meeting and conferring with Union about the proposed Personnel Rules, Court insisted it had the right "to limit or prohibit the distribution of [Union] material in the Courthouse in public areas, and non-work areas." Paragraph 17 of the appendix alleged the rule prohibiting the distribution of union "flyers, leaflets or other material on Court property at any time, and in non-work areas, interferes with and restrains the right" granted under the Trial Court Act and constitutes an unfair practice. To summarize, the charge does not contain a "clear and concise statement" of Union's concern about how the rule applies to mixed-use areas. (Cal. Code Regs., tit. 8, § 32615 subd. (a)(5).)

PERB Regulation 32640, subdivision (a) directs the issuance of a complaint if the charge is sufficient to establish a prima facie case. (Cal. Code Regs., tit. 8, § 32640 subd. (a).) As to the contents of the complaint, PERB Regulation 32640, subdivision (a) states:

"The complaint … shall state with particularity the conduct which is alleged to constitute an unfair practice. The complaint shall include, when known, when and where the conduct alleged to constitute an unfair practice occurred or is occurring, and the name(s) of the person(s) who allegedly committed the acts in question." (Cal. Code Regs., tit. 8, § 32640 subd. (a).)

With respect to deficiencies in a complaint, the regulation states "[PERB] may disregard any error or defect in the complaint that does not substantially affect the rights of the parties." (Cal. Code Regs., tit. 8, § 32640 subd. (a).) It appears this provision is part of the foundation for PERB's unalleged violations doctrine.

Here, the allegations contained in the complaint were less detailed than those stated in the charge. Paragraph 3 of the complaint addressed Court's new restrictions on solicitation and distribution by stating Personnel Rule "17.3 prohibited employees represented by [Union] from soliciting or distributing literature during work hours 'for any purpose unless pre-approved by the [Court Executive Officer].' " The next paragraph stated the implementation of the new rules interfered with employee rights guaranteed by the Trial Court Act and was an unfair practice. The text of the rule quoted in the complaint was from the provision addressing solicitation and was not contained in either of the two paragraphs addressing distributions of literature. Thus, the complaint does not "state with particularity" the ambiguity related to mixed-use areas or allege the ambiguity constitutes an unfair practice.

### The Doctrine Satisfies Core Due Process Requirements

Under the unalleged violations doctrine, PERB has the discretion to consider allegations not included in the charge or the complaint if: (1) the respondent has had adequate notice and opportunity to defend against the unalleged matter; (2) the unalleged conduct is intimately related to the subject matter of the complaint and is part of the same course of conduct; (3) the matter has been fully litigated; (4) the parties have had the opportunity to examine and be cross-examined on the issue; and (5) the unalleged conduct occurred within the same limitations period as those matters alleged in the

40.

complaint. (*State of California (Department of Social Services)* (2009) PERB Dec. No. 2072-S, pp. 3–4 [33 PERC ¶ 177, pp. 3–4].)

In light of these five conditions above we reject the contention that the application of the doctrine is a per se violation of procedural due process. (See U.S. Const., 14th Amend., § 1 [due process clause]; Cal. Const., art. I, § 7, subd. (a) [state due process clause].) Procedural due process in an adjudicative setting requires notice and an opportunity to be heard before a person may be deprived of a protected interest. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333; see 9 Witkin, Cal. Procedure (5th 3d. 2008) Administrative Proceedings, § 3, p. 1099 [basic due process requirements of notice and opportunity for hearing apply to adjudicative proceeding before administrative board].) The notice and opportunity to be heard requirements of procedural due process are built into the conditions that must be met for the unalleged violations doctrine to apply. Consequently, application of the unalleged violations doctrine does not constitute a per se violation of due process.

### *Court Cannot Demonstrate Prejudice in This Case*

Focusing on the adequate notice and opportunity to defend intimately related and fully litigated elements of the test, Court also contends PERB incorrectly found the elements of the unalleged violations doctrine were met in this case. More specifically, Court asserts that if it had "known this claim was being asserted, the Court would have marshaled evidence to argue and prove that Union and Court employees know which areas are working areas, and which are not, including the times distribution is allowed in 'mixed use' areas. Thus, the Court could have proven that the rule is not overbroad. The Court has been prejudiced by being denied this opportunity." The prejudice element is important because the " 'charge need not be technically precise so long as it generally informs the party charged of the nature of the alleged violations' " and, thus, whether an unalleged violation is properly considered turns on whether the changes prejudiced Court.

41.

(See *Ruline Nursery Co. v. Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247, 268.)

Our evaluation of Court's argument about prejudice due to the lack of opportunity to present evidence begins with an examination of the legal theory adopted by PERB when it determined the rule violated the Trial Court Act. If the evidence Court asserts it would have presented is irrelevant to that legal theory, then the lack of an opportunity to introduce that evidence is not prejudicial.

PERB explicitly stated it was not determining that the rule, *as applied*, violated the Trial Court Act. In other words, the issue was not Court's enforcement of the rule restricting distributions. Instead, the violation was based on the legal theory that (1) the rule was ambiguous and (2) the ambiguity interfered with protected rights because it would reasonably tend to limit the exercise of protected rights. PERB stated this theory of interference "requires no showing that employees subjectively felt threatened or intimidated or were actually discouraged from participating in protected activity." This theory takes into consideration the fact that interpretations and applications of ambiguous rules can change over time and guards against "the reasonable possibility of a broad interpretation *in the future* that would produce a chilling effect on protected activity." (Italics added.)

We conclude, under the facts of this case, that Court cannot demonstrate the change was prejudicial. First, the unpresented evidence described by Court is not relevant to the legal question of whether the rule's phrase "in working areas" was ambiguous. The evidence relevant to the inquiry into ambiguity was the text of the Personnel Rules and evidence relating to the existence of mixed-used areas—that is, areas used sometimes for Court's business and other times by employees for meal and rest breaks. Court's argument that it could have presented evidence proving its "employees know which areas are working areas, and which are not, including the times distribution is allowed in 'mixed use' areas" does not identify evidence relevant to

42.

showing whether the text was reasonably susceptible to more than one interpretation. Instead, the evidence relates to how the rule was being applied.[11]

Second, the proposed evidence is not relevant to the other element of the legal theory of interference—that is, whether the ambiguity would reasonably tend to harm employees' protected rights.[12] This theory extends to the possibility future reasonable interpretations would tend to harm the exercise of protected rights. This reasonableness standard is based on an objectively reasonable person, not the subjective understanding of current employees. Court has not described any evidence it could have presented that would negate the reasonable possibility of a future interpretation of "working areas" being adopted that would tend to improperly limit the distribution of union literature, an activity protected by the Trial Court Act. Consequently, Court has not shown the proposed evidence would have been relevant to PERB's determination that the ambiguity interfered with protected activity.

In sum, Court has not demonstrated PERB's application on the unalleged violations doctrine resulted in prejudice.

---

[11]  In line with this analysis, we conclude Court's reliance on *State of California (Employment Development Department)* (2001) PERB Dec. No. 1365a-S [25 PERC ¶ 32057] is misplaced. *California State Employees Association* focused on whether language prohibiting certain union activities "inside the building" was overbroad and determined, based on evidence that areas within the building fluctuated between work and nonwork uses, the language used was overbroad. While Court argues this case demonstrates extrinsic evidence is needed to prove ambiguity, we disagree. Rather, we read this case, which focused on an as applied analysis, to support the conclusion that "work areas" can reasonably have different meanings depending on working conditions. As such, it supports finding the language is overbroad unless circumstances demonstrate there is complete separation between work and nonwork areas, a position Court does not argue.

[12]  As discussed more fully below, a prima facie case of interference with protected rights exists when employer conduct tends to or does result in some harm to employee rights. (See *Carlsbad Unified School District* (1979) PERB Dec. No. 89 [3 PERC ¶ 10031] (*Carlsbad*).)

43.

<u>The Term "Working Areas" Is Ambiguous</u>

Having concluded PERB could properly consider the full scope of the language challenged, we next consider PERB's determination that the rule prohibiting the distribution of literature "at any time for any purpose in working areas" was ambiguous because it was reasonably susceptible of being interpreted to ban distributions in mixed-use areas when such areas were being used by employees who were not on duty. One factor underlying PERB's conclusion about ambiguity was the absence of a definition of "working areas" in the Personnel Rules.

Court contends the plain and reasonable interpretation of the language is that distribution is not allowed in working areas, but is allowed in nonworking areas. In Court's view, the reference to "working areas" necessarily implies that there are nonworking areas and the rule's restriction does not apply in these nonworking areas.

We conclude PERB's analysis is correct. PERB's determination that an ambiguity exists does not violate any of the basic interpretive principles previously discussed. For instance, PERB clearly considered the meaning of the term "working areas" in context, not in isolation. PERB specifically mentioned language in the lead-in sentence of Personnel Rule 17.3.1 referring to the distribution of literature " 'on court property.' " PERB also noted the rule's use of the phrases " 'at any time' " and " 'for any purpose,' " which supported the interpretation that no exceptions would be allowed.

In our review, when considering the language used, the context of the Personnel Rules as a whole, and the undisputed fact that mixed-use areas exist, we agree the phrase "working areas" is reasonably susceptible to more than one interpretation. It is possible to interpret the term "working areas" as areas being used for Court's business and to exclude those same locations when they are used during employee breaks. However, it also is reasonable to interpret the rule as banning distributions in "working areas" at "any time," without regard to whether the area is being used for Court's business at the time of the distribution. (See *Zabrucky v. McAdams* (2005) 129 Cal.App.4th 618, 628 [the word

44.

" 'any' " means " 'without restriction' "].)  As there are two equally reasonable interpretations of the phrase, we conclude Personnel Rule 17.3.1's prohibition of distributions "at any time for any purpose in working areas" is ambiguous.

### The Ambiguity Tends to Limit Protected Activities

Under PERB precedent, an ambiguous rule constitutes interference with a protected right if the ambiguity tends to or does result in some harm to employee rights. (See *Carlsbad*, *supra*, PERB Dec. No. 89 [3 PERC ¶ 10031].)  PERB's decision applied this standard when it concluded the rule constituted improper interference and Court does not argue that PERB chose the wrong legal standard.  Instead, Court contends the rule is neither broad nor vague enough to tend to limit protected conduct.  Alternatively, relying on the fact interference with a protected right that does not demolish that right is balanced against the interests of the employer under *Carlsbad*, Court contends any tendency to limit protected activity is justified by Court's need to convey an image of impartiality and fairness.

In the context of a workers' compensation statute that created a two-pronged test involving (1) an employee's subjective belief and (2) whether that belief was objectively reasonable, the Third Appellate District stated, "the issue of subjective belief is a question of fact, which we review under the substantial evidence rule; and the issue of objective reasonableness is a question of law, which we determine independently." (*Young v. Workers' Compensation Appeals Bd.* (2014) 227 Cal.App.4th 472, 477.)  Here, we conclude the question of whether an ambiguous employer rule would tend to limit employees in the exercise of their rights protected by the Trial Court Act (1) involves the application of a standard of objective reasonableness, (2) presents a question of law, and (3) falls within PERB's area of expertise.

We conclude PERB's determination that the ambiguity in the term "working areas" would have a tendency to limit an objectively reasonable employee's exercise of

the right to distribute literature during that employee's nonworking time is not clearly erroneous. Unlike the rule on dress and appearance that explicitly states employees with questions regarding the appropriateness of business attire can request clarification from their supervisor, the rule restricting distributions has no such provision. Consequently, the ambiguous rule puts Court's employees at risk of discipline for violating the rule and this risk would tend to cause employees to err on the side of caution and forgo exercising the right to distribute literature in mixed-use areas during employee breaks. Moreover, the ambiguity in the concept of "working areas" means that employees distributing literature on their nonworking times in mixed-use areas would be unclear whether they are violating the rule and would therefore be likely to limit their activities to avoid potential punishment.

As to whether the ambiguity in the rule is justified by legitimate interests or concerns of the employer, we conclude it is not. Court argues its interest in appearing to be impartial justifies its rule. We do not discount Court's interest in seeking impartiality in this context. However, we conclude the specific question presented by the circumstances of this case is whether the *ambiguity* is justified by Court's interest in the appearance of impartiality. Unlike the issue regarding union regalia and clothing, the record does not demonstrate any risk of affecting the appearance of impartiality through the distribution of literature in nonworking areas. Moreover, Court has not presented any analysis showing how an ambiguous rule serves its interest in promoting an appearance of impartiality better than a rule that lacks the ambiguity. Consequently, we conclude the ambiguity is not justified by the need to appear impartial. In short, a rule that defined the term "working areas" and resolved the ambiguity would not cause Court to appear less impartial.[13]

---

[13] We note, considering an analysis of the rule concerning the display of writings or images not published by Court discussed more fully below, that the change need not be

Therefore, we conclude PERB correctly determined the rule prohibiting distributions of literature "at any time for any purpose in working areas" (1) was ambiguous, (2) reasonably tended to limit the exercise by Court's employees of a protected right, and (3) was not justified by legitimate employer interests.

<u>Court's Separation of Powers Arguments Are Not Persuasive</u>

In light of our conclusion that PERB could consider the "working areas" dispute and that it correctly concluded that "working areas" was ambiguous, we must next consider Court's arguments that PERB lacked the authority to impose the remedy it chose. Court raised the separation of powers doctrine as an affirmative defense to the complaint. Court concedes PERB has the initial jurisdiction to adjudicate unfair practice allegations but argues that there are limits on PERB's authority to impose a remedy that undermines a trial court's prerogative to control the conduct of persons connected with judicial proceedings and the delivery of other court services.

### *Applicable Law*

Article III, section 3 of the California Constitution states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." This provision provides the basis for California's separation of powers doctrine.

The doctrine of separation of powers includes two distinct concepts. "The first is one of separated functions—dividing the government into three departments and assigning each different responsibilities.… The second aspect focuses on ensuring that each branch maintains its authority and guards against encroachments by the other two branches—or, as we know it, checks and balances." (Teter, *Congressional Gridlock's Threat to Separation of Powers* (2013) 2013 Wis. L.Rev. 1097, 1114; Magill, *The Real*

---

dramatic. Even an adjustment as simple as defining working areas as areas visible to the public would cure the ambiguity issue.

*Separation in Separation of Powers Law* (2000) 86 Va. L.Rev. 1127, 1155–1167 [two distinct conceptions—separating power and balancing power.)

A realistic appraisal of California's separation of powers doctrine leads to the conclusion that the doctrine does not sharply divide the operation of the three branches. (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52 (*Mendocino*).) Instead, judicial decisions have long recognized that the three departments of government are in many respects mutually dependent and the actions of one branch may significantly affect those of another branch. (*Ibid.*) For instance, "[t]he power of the legislature to regulate criminal and civil proceedings and appeals is undisputed." (*Brydonjack v State Bar of California* (1929) 208 Cal. 439, 442–443.) Thus, "the legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions." (*Id.* at p. 444.)

The Trial Court Act is an example of restrictions placed on the courts by the Legislature. For example, section 71636, subdivision (a) provides that a "trial court may adopt reasonable rules and regulations for the administration of employer-employee relations" but requires the court to first consult in good faith with representatives of any recognized employee organization or organizations. The trial court's rules and regulations may address (1) the access of union representatives to work locations and (2) the means of communication by unions with employees, such as the use of official bulletin boards. (§ 71636, subd. (a)(6)–(7).)

Section 71636, subdivision (e) states that "[t]rial court employees and employee organizations shall be able to challenge a rule or regulation of a trial court as a violation of this chapter." Under section 71639.1, subdivision (c), a complaint alleging a violation of the Trial Court Act shall be processed as an unfair practice charge by PERB. "[T]he appropriate remedy necessary to effectuate the purpose of [the Trial Court Act], shall be a matter within the exclusive jurisdiction of [PERB]," except PERB has no authority to

award certain types of damages to compensate for an unlawful strike.  (§ 71639.1, subd. (c).)

### *The Trial Court Act Is Constitutional as Applied*

Court explicitly states it "is not challenging the facial validity of the Trial Court Act."  (See *Briggs v. Brown* (2017) 3 Cal.5th 808, 846 [legislation that truly defeats or materially impairs the court's core functions may be invalidated].)  Yet, Court has argued "it has the exclusive right to determine its rules consistent with its mission."  We reject this argument about Court's exclusive right.  While we do not consider the issue in depth, the provisions of the Trial Court Act described earlier confirm that trial courts do not have the exclusive right to determine the content of the rules and regulations governing its labor relations.  In short, Court's power over employee and union relations is subject to limitations similar to those imposed on other government employers, some of which are set forth in the Trial Court Act.

Regardless, Court states "it is challenging the [Trial Court] Act *as applied* to it by PERB's Order in this particular case."  Court contends "that PERB's Order has harmed the Court by depriving it of its constitutional rights."  The applicable test is whether PERB's application of the Trial Court Act to a particular rule defeated or materially impaired Court's exercise of its constitutional power or the fulfillment of its constitutional function.  (*Mendocino*, *supra*, 13 Cal.4th at pp. 58–59.)  Accordingly, the question presented is whether PERB's determination that the rule prohibiting distributions of literature "in working areas" violated the Trial Court Act defeats or materially impairs Court's exercise of its constitutional power or the fulfillment of its constitutional function.

To identify whether a function of Court might be defeated or impaired, we consider how invalidating the rule will impact Court.  The practical effect of invalidating the ambiguous rule is that Court will have a gap in its rules addressing soliciting and

49.

distributing literature. This gap is relatively narrow, and its duration is within Court's control because it can cure the ambiguity by amending the rule. Also, only distributions of literature that occur outside of "working time" will be unregulated because distributions during working time are prohibited by another provision. Applying the definition of working time in Personnel Rule 17.3.2, the gap will allow a nonworking employee to distribute literature to another nonworking employee even though they are located in a working area.

We conclude the invalidation of the rule will not defeat or materially impair a constitutional function of Court. An impairment, if it exists at all, will last only as long as it takes Court to implement an amendment to the singular rule found improper. Thus, Court's ability to limit the duration of any impairment supports the conclusion that any impairment will not be material. Furthermore, the gap will not frustrate or deprive Court of its ability to perform its functions because the gap affects employees' actions only during their nonworking time—that is, when they are not performing duties that allow Court to function. There is nothing in the record to suggest the delivery of literature from one nonworking employee to another nonworking employee will create inefficiencies and reduce Court's ability to serve the public or perform any function, constitutional or otherwise. (See *Millholen v. Riley* (1930) 211 Cal. 29, 34 [Legislature may regulate the operation of the courts "so long as their efficiency is not thereby impaired"].) Such deliveries of literature were not regulated prior to December 1, 2009, and Court was able to operate. No evidence suggests that distribution of literature between nonworking employees was disruptive or created other problems for Court prior to the adoption of Personnel Rule 17.3.1. Therefore, we conclude the invalidation of the ambiguous rule does not violate the separation of powers doctrine.

*The Restriction on Displaying Writings and Images Is Appropriate*

We next consider the final issue raised in this matter, the restriction on displaying writings and images that are not published by Court in work areas that are visible to the public. The fourth paragraph of Personnel Rule 17.3.1 addresses the display of writing and images by employees in work areas that are visible to the public. We note that the rule banning the display of certain writings and images is more narrowly drawn than the rule governing clothing and adornments. First, the rule for displays does not apply to items published by Court. Second, it is limited to work areas visible to the public.[14]

The proposed ALJ decision stated this rule "is problematic because it creates a categorical restriction on *all* union writings and images without any room for the objective case-by-case balancing of interests required by PERB case law. For example, it is unclear how the display of a union coffee mug or quarter-sized pin in a court reporter's private office, while nominally visible to the public, would detrimentally affect the Court's image of impartiality and neutrality." As with the ban on wearing union regalia, PERB concluded the prohibition on the display of union writings and images in all work areas visible to the public was overly broad and interfered with rights protected by the Trial Court Act.

Our Analysis of Union Regalia Issue Controls

Initially, we conclude the same balancing test applied to items worn by employees applies to the display of writings and images. (See *ante*.) We reach the same conclusion as in our analysis of the restriction on clothing and accessories. Court has a legitimate governmental interest in maintaining the appearance of impartiality by ensuring Court's

---

**14** Although this limitation refers to "work areas," a term highly similar to the "working areas" term we found ambiguous above, we do not uphold PERB on that ground here. First, this term was not separately argued as ambiguous in the briefing to this court. Second, even if it had been, the additional definitional phrase "that are visible to the public" sufficiently narrows the spaces to avoid the ambiguity issues that "working areas" generated.

51.

employees appear impartial. This legitimate governmental interest is sufficient to establish special circumstances that justify a broad restriction on the display of writings and images in areas visible to the public. Accordingly, the ban does not violate the Trial Court Act, and PERB's decision to the contrary must be set aside.

With respect to this issue, we note the record evidence shows Court allowed Union to have bulletin boards for notices, flyers and other materials in locations where the public may see them. The locations included hallways behind the courtrooms that connect to judges' chambers and other offices, such as those used by judicial assistants and court reporters. These hallways are not immediately accessible to the public, but are used by members of the public, such as attorneys, jurors and witnesses. Both PERB and Union agree there is no evidence such displays have resulted in complaints about Court bias.

As with evidence that no prior complaints were raised regarding union regalia, however, we conclude this evidence is insufficient to undercut Court's legitimate interest in ensuring it is perceived as impartial. The lack of prior complaints does not demonstrate no bias has been perceived, particularly given those most likely to see the signs are not litigants themselves at the time they would be in the hallways. Nor does the lack of formalized complaints undercut the well settled law demonstrating Court's interest in impartiality is sufficient to prospectively restrict several forms of speech on or around the courthouse. Finally, nothing about the fact union views have been expressed on bulletin boards limits the fact that display of other messages on such bulletin boards could create a perception of impartiality and thus could reasonably be restricted. We see nothing about the historical display of union materials on bulletin boards in the courthouse that would justify exempting them from an otherwise reasonable rule on the display of non-court published messages in areas visible to the public.

52.

## DISPOSITION

The writ of extraordinary relief is granted and the parts of the PERB decision invalidating the portion of Personnel Rule 1.11 addressing images and writings on clothing or adornments and the first (solicitation) and fourth (display) paragraphs of Personnel Rule 17.3.1 are set aside. The part of the PERB decision invalidating the third paragraph (distributions in working areas) of Personnel Rule 17.3.1 is not set aside.

The parties shall bear their own costs of this proceeding.

_____

Hill, P.J.

I CONCUR:


_____

LEVY, J.

Franson J., concurring and dissenting.

I concur in the majority's conclusions about the validity of the rule limiting solicitations and the invalidity of the rule prohibiting the distribution of literature in "working areas."

On the question of special circumstances, I agree that trial courts have a legitimate interest in their staff appearing impartial and this interest constitutes special circumstances justifying *some* reasonable restrictions on union regalia, writings and images. For instance, no one seriously contends the Trial Court Act prevents California's trial courts from having a dress code and requires trial courts to allow employees to display union picket signs inside court facilities or wear pins and buttons that contain profanity, incite violence, disparage specific individuals, or disrupt or disturb the character, integrity or operations of a courthouse.

While some reasonable restrictions are appropriate, total bans on union materials in a workplace are rarely upheld because applicable law requires the restrictions be narrowly tailored to the special circumstances. Here, the majority upholds personnel rules banning *all* courthouse employees from wearing or displaying *any* item of union regalia. They conclude that wearing or displaying such items so evidences a pro-union bias or prejudice by the employees *and* the court that it undermines a fair and independent judicial system. With no evidence in the record to support this conclusion, the majority relies on a fundamental misconception—namely, that objective members of the courthouse public believe trial court employees who wear or display union items cannot be ethical, fair and impartial in carrying out their duties. This is where I part company with my colleagues and conclude the public can see a trial court employee wearing or displaying appropriate union regalia without reasonably doubting the impartiality of the employee or the court itself.

When the special circumstances are a trial court's interest in appearing impartial, that appearance must be evaluated from the perspective of a fully informed, objectively reasonable member of the public. A partisan litigant emotionally involved in a lawsuit with a union, or someone with an anti-union bias, is not the disinterested objective observer whose doubts concerning the trial court's impartiality provide the governing standard. Thus, the possibility that some Californians hold strong anti-union views is not a legitimate justification that outweighs the statutorily protected right of trial court employees to wear union pins and buttons.

In my view, a fully informed, objectively reasonable member of the public would be aware that the employees of Fresno County Superior Court (Court) are unionized. That person would also be aware that the Legislature authorized trial court employees to unionize, which shows the Legislature has determined that unionized trial court employees can perform their jobs without inappropriate favoritism toward litigants who are unions or, more generally, employees. In these circumstances, a member of the public who might notice a court employee wearing an innocuous union pin or button would not reasonably entertain doubts about the employee's impartiality, or doubts about the pin or button influencing a judge. The same conclusion applies a mouse pad or coffee mug bearing a union logo. Therefore, I conclude Public Employment Relations Board (PERB) correctly determined the bans were overly broad and the Court failed to carry its burden of establishing special circumstances justifying such a far-reaching, total ban. What little evidence the Court presented failed to establish that reasonable restrictions, narrowly tailored to an objectively reasonable appearance of impartiality, could not be crafted to meet the special circumstances. Consequently, I respectfully dissent from the majority's decision that PERB erred when it found the Court's rules were overly broad and unnecessarily interfered with rights protected by the Trial Court Act.

2

I.    THE APPEARANCE OF IMPARTIALITY AS A SPECIAL CIRCUMSTANCE

A.    The Interest in Appearing Impartial

Service Employees International Union Local 521 (Union), PERB and the administrative law judge (ALJ) all have recognized that a trial court's interest in the appearance of impartiality is a special circumstance that might justify some restrictions on wearing union regalia or displaying union writings and images.  Based on the positions taken by the parties and the evidence presented, I agree with the majority that California's trial courts have a strong, legitimate interest in the appearance of impartiality that extends to employees who are not judges or commissioners.  I also agree this legitimate governmental interest constitutes special circumstances justifying *some* restrictions on union regalia, writings and images in trial court facilities.

B.    Defining Impartiality

Having reached the foregoing conclusions, my analysis takes a path different from that of the majority.  The next steps should (1) define the term "impartiality" and (2) identify the appropriate standard for evaluating the appearance of impartiality.

First, the definition of impartiality established for judges by the disqualification statutes and the California Code of Judicial Ethics should be applied in the present context.  (See Code Civ. Proc., §§ 170.1, 170.2; Cal. Code Jud. Ethics, canons 2A, 3E.)  These rules are designed to assure the public that impartial judges are handling cases and, therefore, necessarily address the appearance of impartiality.  (See Cal. Code Jud. Ethics, canon 2A [promoting public confidence].)  It makes little sense to hold court employees to a higher standard than the standard applied to judges, because the public perception created by employees adhering to the higher standard would be undermined if judges operated under a lower standard.  Accordingly, it is rational and internally consistent to adopt a single definition.  Therefore, the definition of "impartiality" adopted by the California Supreme Court in *Haworth v. Superior Court* (2010) 50 Cal.4th 372 (*Haworth*) and followed by the Fourth District in *Wechsler v. Superior Court* (2014) 224

3

Cal.App.4th 384 (*Wechsler*) is appropriate. " 'Impartiality' entails the 'absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind.' "**1** (*Haworth*, *supra*, at p. 389; see *Wechsler*, *supra*, at pp. 390–391.)

Second, the appropriate standard for evaluating the appearance of impartiality is an objective one. (*Haworth*, *supra*, 50 Cal.4th at p. 389; *Wechsler*, *supra*, 224 Cal.App.4th at p. 391.) Specifically, the trial court's interest in the appearance of impartiality is unduly compromised "if a fully informed, reasonable member of the public would fairly entertain doubts that the [employee] is impartial." (*Wechsler*, *supra*, at p. 391.) This wording conforms with the statutory language stating a judge shall be disqualified if for any reason "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iiii).)

An objectively reasonable member of the public " 'is not someone who is "hypersensitive or unduly suspicious," but rather is a "well-informed, thoughtful observer." ' [Citation.] '[T]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the *disinterested objective observer* whose doubts concerning the [employee's] impartiality provide the governing standard.' " (*Haworth*, *supra*, 50 Cal.4th at p. 389.) Also, the reasonable member of the public is a layperson— that is, someone outside the judicial system. (*Wechsler*, *supra*, 224 Cal.App.4th at p. 391.)

---

**1** Similarly, the terminology section of the California Code of Judicial Ethics states: " 'Impartial,' 'impartiality,' and 'impartially' mean the absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as the maintenance of an open mind in considering issues that may come before a judge."

C.     Examples of Applications of the Impartiality Standard to Judges

The context for evaluating a trial court's interest in the appearance of impartiality of nonjudicial employees is provided (in part) by how the standard for disqualifying judges is applied to specific situations.  (See Code Civ. Proc., §§ 170.1, 170.2.)  For example, a judge whose private practice was devoted exclusively to labor relations and representing either unions or employers may not handle labor relations cases immediately after appointment to the bench if the judge previously serve as a lawyer (1) in that proceeding or (2) in any other proceeding that involved the same issues and a party in the present proceeding.  (Code Civ. Proc., § 170.1, subd. (a)(2)(A).)  Also, the judge is disqualified from handling a case involving a former union or employer client if (1) less than two years has passed since the party was a client of the judge or (2) another disqualification provision applies.  (Code Civ. Proc., § 170.1, subd. (a)(2)(B)(i).)  These statutory provisions logically imply that an objectively reasonable member of the public would perceive judges, who are not disqualified under these provisions, to be impartial. For instance, a judge who was a union labor relations attorney could handle labor relations cases immediately after appointment to the bench so long as he did not serve as a lawyer in the proceeding and none of the parties are former clients.  In these situations, the trial court's interest in appearing impartial is not compromised by allowing judges to preside over such cases.

The statute provides further examples.  A judge is allowed to handle a proceeding where a person within four degrees of kinship is a party, but is disqualified if a party is "within the third degree of relationship" to the judge.  (Code Civ. Proc., § 170.1, subd. (a)(4).)  Under this provision, a judge may not handle a case where a niece or nephew is a party, but not disqualified from a case involving a first cousin.  (See *People v. Williams* (1997) 16 Cal.4th 635, 653 [brothers are related in the second degree, uncle and nephew in the third, and first cousins in the fourth].)  The statute demonstrates that, when evaluated under by an objectively reasonable person standard, the appearance created by

5

a judge handling a case involving a first cousin does not unduly impinge upon trial court's interest in the appearance of impartiality.

In addition, a judge is disqualified from a case where, within the past two years, a lawyer appearing in the case was associated in the private practice of law with the judge. (Code Civ. Proc., § 170.1, subd. (a)(2)(B)(ii).) Thus, an objectively reasonable person would perceive a judge is able to be impartial in a case where the judge's former law partner is representing a party when that law partnership has been terminated for more than two years.[2]

A further illustration of the judiciary's need to appear impartial is provided by this original proceeding. All three members of the panel deciding this case served as judges at the Court, the party now appearing before us. While some people might infer the appearance of impartiality would have been served by transferring this original proceeding to another district or, alternatively, having it heard by justices who had not served as superior court judges in Fresno County, that inference is not warranted under the objectively reasonable person standard. (Cf. Cal. Rules of Court, rule 10.660.) More specifically, no member of this panel "substantially doubts his … capacity to be impartial" or has concluded "the circumstances are such that a reasonable person aware of the facts would doubt the justice's ability to be impartial." (Cal. Code Jud. Ethics, canon 3E(4)(b), (c); cf. Code Civ. Proc., § 170.1, subd. (a)(6)(A)(ii), (iii).)

---

[2] These examples establish that the appearance of impartiality is not the be all, end all of the judicial system. Instead, the interest in appearing impartial is one of several interests that have been considered and balanced in creating the various rules by which California's judicial system operates. Similarly, the Trial Court Act and PERB precedent require the Court's interest in the appearance of impartiality to be balanced against the rights protected by the Trial Court Act. (See *East Whittier School District* (2004) PERB Dec. No. 1727, p. 10 ["what constitutes a 'special circumstance' necessarily involves a balancing of various interests"].)

D.    Overbreadth Analysis

Before applying the foregoing objective standard to the evidence presented in this case, two points are worth making about analyzing the overbreadth of the Court's bans on union materials.  First, the positive effect of the bans on a variety of *nonunion* materials is not a factor that justifies banning union materials.  The wearing and display of union materials is protected by the Trial Court Act, while nonunion materials are not protected by statute.  Second, bans on union materials must be narrowly tailored to the special circumstances.

### 1.    *Effect of Banning Nonunion Regalia, Displays and Writings*

The majority concludes the Court's interest in appearing impartial justifies the breadth of the Court's rules, and states, "it has been argued that a total ban on insignia and regalia is overbroad, particularly with respect to union views"[3] and refers to nonunion messages such as "Drill Baby Drill" and "Save the Whales."  (Maj. opn., *ante*, at pp. 23-24.)  This approach appears to give weight to the salutary effect of banning certain messages *unrelated to the rights protected by the Trial Court Act* and then uses that weight as part of the justification for banning all union regalia.  Such an approach is legally erroneous since the proper framing of the issue is whether the total ban violates the Trial Court Act because it interferes with statutorily protected rights.  Whether the total ban's prohibition of nonunion materials and messages violates other rights—such as rights to due process, freedom of expression and freedom of association—is irrelevant to our review of PERB's overbreadth determination because no such rights are being asserted in this proceeding.

Accordingly, PERB did not commit legal error in its overbreadth analysis by limiting its inquiry to the impact of the Personnel Rules on union regalia and displays.

---

**3**    PERB and the Union challenge the Court's rules as overbroad *only to the extent* the rules affect union insignia and regalia and thereby infringe upon statutorily protected rights of the Court employees.

7

An example of this focused analysis, which distinguished between union and nonunion items, is provided by a Massachusetts case involving a sheriff's directive prohibiting his "employees from 'wearing … any pins or other [unauthorized] accouterments' on their uniforms." (*Sheriff of Worcester County v. Labor Relations Com.* (2004) 60 Mass.App.Ct. 632, 633 [805 N.E.2d 46] (*Worcester*).)  The labor commission concluded the directive violated the Massachusetts labor relations statute[4] and ordered the sheriff to bargain with the union before imposing a ban on *any* pins or to refrain from interfering with the employee's rights to wear *any* pins, including union insignia pins. (*Worcester, supra,* at p. 47.)  The appellate court adopted a narrower approach, stating the wearing of union insignia was a right protected by the statute and, therefore, was unlike the wearing of other items, such as guardian angel buttons or tie clips. (*Id*. at p. 53.)  The court concluded that "to the extent the sheriff's directive prohibited nonunion buttons and other nonunion accouterments, the directive did not violate" the Massachusetts statute.  (*Ibid*.)  Based on this conclusion, the court reversed certain paragraphs of the labor commission's order, but only "insofar as they pertain to badges, pins, and any nonstandard uniform attire *other than pins and badges containing union insignia*." (*Id*. at p. 54, italics added.)  In contrast, the court concluded the labor commission's determination that the sheriff's directive violated the statute, insofar as it affected union buttons, "was supported by substantial evidence and did not amount to an error of law." (*Ibid*.)  As a result, the court affirmed the part of the labor commission's order that directed the sheriff to refrain from interfering with the employees' right to wear pins containing the union's insignia. (*Id*. at pp. 47, 54.)

---

**4**      The statute, section 10 of chapter 150E of the Massachusetts General Law, states public employees have the right to engage in concerted activities for the purpose of collective bargaining, free from interference, restraint or coercion.  Like California's statute, this provision is interpreted to provide public employees with the right to wear union insignia absent a showing of special circumstances. (*Worcester*, *supra*, 805 N.E.2d at p. 52.)

Similarly, the Court's ban on nonunion regalia and displays does not violate the Trial Court Act, and the benefits derived from banning nonunion items cannot be used to justify the categorical ban of union regalia. The scope of the ban, however, is properly considered at the remedy stage. In this case, PERB's two-part remedy appropriately distinguished the rule's application to nonunion regalia and displays from the rule's unlawful application to union regalia and displays.

PERB determined "the Court's rules prohibiting employees from wearing union regalia anywhere in the courthouse and the display of union writings and images in all work areas visible to the public were overly broad and interfered with protected rights under the Trial Court Act." To remedy this statutory violation, PERB exercised its authority under Government Code section 71639.1[5] and ordered the Court to (1) cease and desist from interfering with employees' right to communicate with each other in the work place and (2) rescind those portions of personnel rules 1.11 and 17.3 *to the extent* they "categorically prohibit employees from wearing union regalia in the courthouse" and "categorically ban the display of union writings and images in all work areas visible to the public."

The first part of PERB's order directed the Court to cease and desist from interfering with the rights of its employees protected by the Trial Court Act. This cease and desist order prevents the Court from enforcing the personnel rules as they relate to union regalia and displays of union writings and images. The order does not affect the ban on regalia and displays relating to Mothers Against Drunk Driving, environmental causes, animal rights, water issues, sports teams, consumer products such as alcoholic beverages, and other nonunion subjects.

---

[5] All further statutory references are to the Government Code unless noted otherwise.

The second part of PERB's order directed the Court to rescind those portions of personnel rules 1.11 and 17.3 *to the extent* they affect union regalia and displays of union writings and images. This rescission order does not overstep the bounds of PERB's authority because it is specifically tailored to the statutory violation, which relates to union materials only. Stated another way, PERB did not direct a complete rescission of the fourth paragraph of personnel rule 17.3.1 (display) or of the bullet point in personnel rule 1.11 addressing clothing and adornments—a remedy that might have exceeded its authority. (See *City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1278 [court annulled PERB's order to rescind measure].)

In summary, PERB did not commit legal error when it gave no weight to the potentially salutary effect of the Court's bans on nonunion materials. Rather, PERB properly limited its analysis of a statutory violation to the effect of the bans on union regalia and displays.

### 2. *Difficulty in Upholding Total Bans*

The parties do not dispute that determining whether special circumstances justify a rule affecting union regalia and other union materials involves a balancing test that weighs the Court's interest in appearing impartial against the statutory rights of the employees. That balancing process is guided by a variety of principles. (See *In-N-Out Burger, Incorporated v. N.L.R.B.* (5th Cir. 2018) 894 F.3d 707, 715-716 (*In-N-Out Burger*).) One of those general principles has been expressed as follows:

> "[E]ven if an employer demonstrates an otherwise sufficient interest in restricting its employees' right to wear protected items, a rule doing so is unlawful unless the employer also shows that it is 'narrowly tailored to the special circumstances justifying [its] maintenance.' [Citation.] Under this rubric, wholesale or 'blanket' bans are rarely, if ever, lawful." (*Id.* at p. 715.)[6]

---

[6] The Court, accepting the applicability of this principle, argued to PERB in its posthearing brief that its dress code was a narrowly-tailored means of protecting the Court's image of impartiality and neutrality.

10

This principle is significant in this proceeding because it shows special circumstances can justify some restrictions that affect the wearing of union regalia, but do not necessarily justify a total ban on all union regalia. Here, PERB and the Union recognize that the Court's interest in appearing impartial justifies some restrictions on union regalia. They challenge the Court's bans on the ground that the restrictions were overly broad, rather than narrowly drafted to fit the need to appear impartial to an objectively reasonable public.

E.  Evidence Relating to Perceptions of Union Bias

This section reviews the evidence presented by the Court to support its argument that the total ban on union regalia was narrowly tailored and justified by special circumstances. What is striking about this evidence is its limited scope.[7] The Court presented no evidence addressing the impact of union regalia on the public's perception of the Court's impartiality. The majority's findings of fact on this issue are unsupported by any evidence. Simply put, those findings are the product of conjecture, speculation or perhaps the application of a subjective standard of reasonableness based on the supposed feelings of a hypersensitive observer.

1.  *Summary of the Court's Evidence*

At the hearing before the ALJ, the Court submitted 11 exhibits and the testimony of one witness—Sheran Morton, the Assistant Court Executive Officer. Two of these exhibits—the Court's personnel manual and its table of contents—were submitted by the Court and the Union as joint exhibits. The Court's own exhibits were (1) the Court's mission statement; (2) materials from the "PJ/CEO Roundtable: Trial Court Leadership

---

[7]    The lack of evidence may be explained in part by counsel's tactical decision to place much stock in the argument that the Court is entitled to a presumption that a total ban is justified and, thus, the burden of presenting evidence is shifted to the Union. PERB rejected such a presumption, concluding it was not appropriate for all areas of the Court's facilities. The majority and I agree that PERB did not misinterpret the Trial Court Act when it rejected such a presumption. (Maj. opn., *ante*, at p. 20.)

11

for Ethical Excellence," which included a copy of the Code of Ethics for the Court Employees of California; (3) floor plans for its 11 facilities; (4) job descriptions for its series of office assistants; (5) a list of wrongful termination and other employment cases filed from January 1, 2011, to March 2, 2011, and filed during the 2010 calendar year (24 and 140 cases, respectively); (6) a list of 146 case titles involving well-known entities as parties; (7) the floor plan and photographs depicting level five of the B.F. Sisk Building;[8] (8) the floor plan and photographs depicting level four of the B.F. Sisk Building;[9] and (9) the floor plan and photographs for the fourth floor of the main courthouse.

Morton was hired by the Court in June 1986 as a legal secretary and has held a variety of positions. In 2003, she was promoted to Director of Court Operations. She held that position until early 2008 when she was made Assistant Court Executive Officer. (See generally, Cal. Rules of Court, rule 10.610 [duties and responsibilities of court executive officer].) The ALJ's proposed decision summarized a portion of Morton's testimony as follows:

> "[Morton] testified that the Court sought to amend the personnel rules to include Sections 1.11 and 17.3 in order to further its mission and guard against the perception of bias toward one party over another. She also testified that the Court already had unwritten rules in place similar to Sections 1.11 and 17.3. However, because they were unwritten, the Court was having trouble enforcing them and wanted to memorialize them in the personnel rules. Morton stated that she was not aware of any employee being disciplined for violating the unwritten policies."

The other aspects of Morton's testimony relied upon by the Court is shown by the posthearing brief the Court filed with PERB. In that brief, the Court referred to Morton's testimony to support its position that the Court hears many cases involving controversial

---

[8] The Court began moving a large portion of its civil operation into the B.F. Sisk Building in November 2010 and finished in January 2011. Departments 501, 502, and 503 and an alternative dispute resolution office are located on level five of that facility.

[9] Level four contains the courtrooms and chambers for Departments 401, 402, 403 and 404. It also contains a civil clerk's office.

issues and prominent entities. The Court also stated Morton's testimony provided "a number of examples illustrating how wearing seemingly harmless regalia supporting an organization could create a perception of bias." None of Morton's examples involved union regalia. Instead, one example addressed items supporting Mothers Against Drunk Driving and Morton's opinion as to the impact of those items on criminal defendants and their families as to the fairness of the proceedings. The Court stated Morton's testimony provided "similar examples regarding the [Society for Prevention of Cruelty to Animals], water rights, and Fresno State University."[10]

### 2. Bias of Union Members

The majority's position relies on the fundamental misconception that members of the courthouse public believe Court employees who wear or display union items cannot be ethical, fair and impartial in carrying out their employment duties and, therefore, the public must be shielded from seeing a Court employee wearing or displaying any type of union item.

As foundation for my analysis of public perception of unionized trial court employees, this section addresses the basic point of whether union members can be fair and impartial employees. Neither the Court nor the majority has argued that actual bias—past or future—has been established by the evidence. Thus, actual bias is not part of the majority's justification for the ban of union regalia and the restrictions on displays of union writings and images. My review of the record confirms that there is no direct or circumstantial evidence that any employee of the Court performed his or her job responsibilities in a manner that was biased—that is, adverse to an employer or favorable to an employee or union. Similarly, I located nothing in the evidence to support a finding that in the future Court employees are reasonably likely to carry out their duties in a

---

**10** As discussed in part I.D.1, *ante*, concerns about a wide variety of nonunion items and messages are irrelevant to whether a ban on union regalia and other union items is justified.

13

manner that is biased against employers and favorable toward unions or unionized employees. Therefore, the public's perception of Court employees who are unionized is not influenced by any instance of past bias or by facts suggesting future bias is reasonably foreseeable.

Furthermore, the legislative determinations underlying the Trial Court Act preclude a general inference that trial court employees who are union members cannot be fair and impartial in handling a case where a union or a member of a union is a party. In 1968, the Legislature passed, and Governor Reagan signed, the Meyers-Milias-Brown Act, which gave local (i.e., city and county) employees, including trial court employees, the right to collective bargaining. (See *Orange County Employees Assn., Inc. v. Superior Court* (2004) 120 Cal.App.4th 287, 293 [prior to enactment of Trial Court Act, labor relations of trial court employees were governed by Meyers-Milias-Brown Act].) The legislative decision to allow trial court employees to unionize was continued in 2000 with the adoption of the Trial Court Act. (See *Alameda County Management Employees Assn. v. Superior Court* (2011) 195 Cal.App.4th 325, 329-330 [origins of the Trial Court Act].) The Legislature would not have adopted either act if it had determined unionized trial court employees could not act impartiality when handling cases involving a union or a union member.

Accordingly, an analysis of the public's perception of trial court employees who are members of a union should recognize, as a general matter, that unionized trial court employees are capable of acting impartiality when handling cases involving a union or a union member. From this foundation, the following question is presented: What is it about union regalia that might trigger an objectively reasonable perception that either the trial court employee or the trial court itself is biased? As discussed below, it must be something more than just informing the public that the employee is a union member.

14

### 3. *Public Perception of Bias of Union Members*

The reasoning behind public perception justifying a total ban on union regalia is that an objectively reasonable member of the public who sees a Court employee wearing any type of union pin, button or lanyard will have the following thoughts. First, the person will recognize the item as signifying the Court employee is a Union member. Of course, the probability of recognition decreases with smaller items and as the distance between the member of the public and the employee increases. Second, in the instances when the person has recognized the item, that recognition will cause the person to "fairly entertain doubts" about the Court's impartiality in handling a case involving a union or union employee. (*Wechsler*, *supra*, 224 Cal.App.4th at p. 391.) Apparently, these doubts relate to two aspects of the Court's operation. The first doubt is whether the regalia-wearing employee will perform his or her functions at the Court impartially or, alternatively, will perform his or her job in a manner that favors a union or union employee. The second doubt relates to the possibility that the wearing of the regalia places persistent and identifiable pressure on the decision-making process of the Court. (See Maj. opn., *ante*, at pp. 20-21.)

PERB did not commit factual or legal error when it determined the evidence was insufficient to establish these doubts would be fairly entertained by an objectively reasonable member of the public. In fact, there was no evidence to support the majority's reasoning. Stated from another perspective, the evidence presented is not so strong that it compels this court to find, as a matter of law, that such doubts would be fairly entertained by an objectively reasonable member of the public. (See *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*) [failure-of-proof determinations by a trier of fact are reviewed to determine whether the evidence compels as a matter of law a finding in favor of appellant].)

An objectively reasonable member of the public is a well-informed, thoughtful observer and is not someone who is unduly suspicious or hypersensitive. (*Haworth*,

15

*supra*, 50 Cal.4th at p. 389.) Such a person does not harbor a deep-seated anti-union bias or prejudice. Under this standard, the member of the public might not have detailed knowledge of the provisions of the Trial Court Act, but would be aware of the general fact that the Legislature has authorized trial court employees to unionize. (See *Santos v. Brown* (2015) 238 Cal.App.4th 398, 410.) Such a person also would be aware that the employees of the Court have chosen to be represented by a union. Consequently, the critical piece of information provided to the public by the *wearing* of the item of regalia is not that the Court employee is a union member, but that the employee has chosen to communicate that fact to others. In other words, the logic of the Court's position is that objectively reasonable members of the public, who generally do not perceive union employees to be biased, begin to have reasonable doubts about the employee's impartiality when the employee communicates his or her union membership by wearing an item of regalia. Whether this perception is objectively reasonable cannot be decided without considering the particular items of regalia that purportedly creates the perception.[11] This conclusion is consistent with PERB's case-by-case approach to determining whether special circumstances justify banning a particular button or pin. (See *East Whittier School District*, *supra*, PERB Dec. No. 1727, pp. 13, 19–20 [test for special circumstances "must be an objective one based on an examination of the buttons at issue"].) Here, PERB did not commit legal error when it considered the items of regalia submitted by the Union as part of its evaluation of whether the restrictions were narrowly tailored to the circumstances.

Here, a review of two items of regalia in the record is sufficient to demonstrate the lack of narrow tailoring. The first is a square metal pin that is smaller than a quarter (less than one square inch) and has the Union's logo on the top portion, while underneath the

---

[11] The need to look at each item of regalia affected, including the most innocuous, when conducting an overbreadth analysis is a reason why total bans on union regalia "are rarely, if ever, lawful." (*In-N-Out Burger*, *supra*, 894 F.3d at p. 715.)

16

logo are the letters "SEIU" and underneath the letters is the number "535," the local that represented the Court's employees before a Union reorganization. This pin lacks any slogan and communicates little information about the wearer's views, except that the wearer is a Union member and proud enough of that fact to wear the pin. PERB in its role as trier of fact was not compelled, as a matter of law, to find that a member of the public reasonably would harbor doubts about the impartiality of a Court employee wearing this pin. In other words, the pin is not the tipping point that renders it reasonable for the public to fairly doubt the impartiality of the Court's unionized employees.

The second item is a metal button that is approximately two inches in diameter. The center of the button contains the letters "SEIU" with a line above and below the letters. At the bottom edge of the button (where the year is located on coins issued by the United States Treasury) is the date "September 11, 2001." The outer edge of the upper half of the button contains the slogan, "Remembering and Rebuilding Together." This button and the message it conveys would not cause an objectively reasonable member of the public to harbor reasonable doubts about the ability of the wearer to be impartial in performing his or her job at the Court. Thus, further justification is needed to prohibit the wearing of such a button. Without that additional justification, the categorical ban is overly broad and a violation of the Trial Court Act.

In summary, based on the record before us, the majority's view that unionized trial court employees wearing any type of union pin or button would be perceived by the objective public as partial towards litigants who are unions or union members is not objectively reasonable.[12] Rather, it is an affront to these employees.

---

[12] The absence of evidence coupled with the majority's conclusions as to the doubts entertained by reasonable members of the public upon seeing a trial court employee wearing any type of union regalia have implications that are disconcerting. Generally, courts should consider the consequences that flow from the statutory interpretation they adopt. (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291.) Here, the majority's construction of the Trial Court Act establishes precedent informing the

17

#### 4.  *Pressure on Decision-Making Created by Union Regalia*

An additional justification offered by the majority is that an objectively reasonable member of the public would fairly entertain doubts about the ability of judges and commissioners to act impartially when confronted by the persistent pressure created by the inch-square pin or the two-inch button.  (See Maj. opn, *ante*, at pp. 20-21.)  The Court presented no evidence that any judge or commissioner actually was influenced by any button, pin or lanyard worn by an employee.  Not only is it insulting to argue that any judge would feel pressured by innocuous union regalia worn by his or her unionized staff (particularly when judges already know their staff are Union members), there is no evidence supporting the finding that a member of the public would reasonably infer that judges would abandon their ethical responsibility of acting impartially due to a persistent and identifiable pressure created by a small union pin without a slogan or by a two-inch button with the slogan "Remembering and Rebuilding Together."

The majority cites *Cox v. Louisiana* (1965) 379 U.S. 559, as the foundation of its arguments that the Court has a duty to maintain a neutral appearance, how "public actions" may affect the appearance of impartiality, and why laws may protect the judicial process from being misjudged by the public.  (Maj. opn., *ante*, at p. 15.)  Unlike the present case of Court employees displaying Union regalia to show solidarity, *Cox* involved 2,000 people parading and demonstrating across the street from a courthouse in protest of what they felt were illegal arrests the day before.  Tear gas was deployed, and it was assumed that the intent of the demonstration was to influence the judges, jurors, witnesses or court officials.  I do not read *Cox* as supporting, much less compelling, a finding of fact that a judge would be so easily swayed or, alternatively, that the public

---

superior courts of every county in California that allowing members of the public to see a court employee wearing any type of union regalia will create a public perception of bias and, moreover, failing to categorically ban such items amounts to shirking their responsibilities to the public and to the state judicial system.

18

would reasonably perceive judges were so lacking in resolve that they would be influenced by the wearing of the pins or buttons described earlier.

The majority's conclusion that the public would reasonably entertain doubts about the impartiality of the Court's decision-making if employees were allowed to wear such innocuous union regalia has no evidentiary support. It overlooks the evidence in the record about the actual items of union regalia worn by employees before the total ban was implemented, the lack of any complaints ever by members of the public about the Union, and wrongly implies the public views California's trial judges as willing to abandon their ethical responsibilities at the slightest of pressures.

Based on the evidence in the record, PERB did not err when it determined the Court failed to carry its burden of justifying a total ban on union regalia.

F.     Other Issues Related to Impartiality and the Scope of the Ban

1.     *Complaints About Employees*

The Court presented no evidence of complaints from litigants or other members of the public about employees wearing union regalia. In contrast, the Union presented testimony from witnesses that, prior to the adoption of the categorical ban, employees routinely wore union regalia on their clothing, including buttons, pins and lanyards, without incident or complaint.

Part of the evidence relied upon by PERB in finding the Court's interest in the appearance of impartiality did not justify a categorical ban on union logos and regalia was (1) the Court's history of having no such policy, written or unwritten, before December 1, 2009, and (2) the employee testimony that they routinely wore such items without incident before the new policy went into effect.

The absence of complaints and incidents is relevant to the existence of special circumstances and the specific issue of whether the appearance of impartiality justifies a total ban. (See Evid. Code, § 210 [definition of relevant evidence].) The various

19

authorities have not spoken with a single voice about the weight to be given to the absence of prior complaints or incidents, but the decisions clearly establish that the evidence passes the threshold of relevance. (Cf. *Saint John's Health Center* (2011) 357 NLRB 2078; *St. Luke's Hosp.* (1994) 314 NLRB 434, 435 [no evidence any patient complained of, or even noticed, the stickers and buttons at issue] with *Boise Cascade Corp.* (1990) 300 NLRB 80, 84 [evidence that pins had been worn for six months without incidence was "most important point" in determining absence of special circumstances].) Accordingly, PERB did not err when it (1) impliedly determined the Union witnesses testified credibly on the absence of incidents or complaints and (2) considered the Court's history in allowing union regalia and the absence of complaints or incidents in making its determination that the Court had not carried its burden.

### 2. *Union Caseload*

The Court's exhibit 6 listed 146 titles of cases involving well-known entities as parties. The list begins with a case filed in 2002 and includes cases filed in early 2011. Only three case titles identify a union as a party. In 2008, Community Regional Medical Center sued Carpenters Union Local 701. In 2009, the International Association of Firefighters Local 753 sued the City of Fresno. Also, in 2009, the Union sued the Fresno County Board of Supervisors. Only one of the three cases involved a private sector employer.[13] The Court presented no evidence about its caseload for that period.

---

**13** The failure to develop better evidence about union cases handled by the Court cannot be attributed to the inexperience of counsel. The Court's attorney represented the Sonoma County Superior Court in an unfair practice case based on charges filed by Local 1021 of the Union. In that case, the Union challenged the trial court's imposition of a new policy barring staff from wearing union buttons and displaying union signs or posters in public areas. The court produced statistics from 1988 through May 5, 2008, of the number of cases filed that involved a union as a party. The total was 86 cases involving eight different unions. The 44-page proposed decision of the ALJ found the Sonoma County Superior Court's ban on all union regalia violated the Trial Court Act. The ALJ's proposed decision has no authority as precedent and the proceeding did not result in a final administrative decision by PERB.

Consequently, PERB did not determine what proportion of the Court's caseload involved a union as a party. However, information about the Court's caseload is readily available to the public in the Court Statistics Report published each year by the Judicial Council of California. The 2010 Court Statistics Report contains data from the 2008-2009 fiscal year—the last fiscal year completed before the new policy was adopted in December 2009. That report shows the Court had 43,199 civil filings and 193,836 criminal filings during that fiscal year, or a total of 237,035 filings. This data provides some context for evaluating the relative importance of the one filing involving a dispute between a union and a private sector employer in the nine-year period covered by the Court's exhibit.

The evidence presented shows that the Court's interest in appearing impartial in private sector union cases arises only rarely. The Court handles few cases involving unions and even fewer cases involving a union and a private sector employer. Consequently, the interest in appearing impartial in those type of cases is slight, especially when the Court's entire caseload is considered. Allowing so few cases to justify a Court policy that impacts the employees' long recognized and statutorily protected right to wear union pins and buttons can hardly be described as the tail wagging the dog. It is more comparable to the shake of a leg of a flea on the tail of a Great Dane wagging the Great Dane.

### 3. *Employment Litigation Caseload*

The Court argues that its need to appear impartial extends to all types of employment disputes and, therefore, it is appropriate to consider the impact of union regalia on the parties involved in employment litigation. The Court offered evidence that approximately 140 wrongful termination and other employment cases were filed during the 2010 calendar year and 24 cases were filed in the first two months of 2011. While it is true the Court has a legitimate interest in appearing impartial in these and all other cases, these employment cases account for less than one-half percent of the Court's civil

filings, or one out of every 308 civil filings (43,199 divided by 140). When compared to the total filings in the fiscal year before the new rules were implemented, the employment cases account for less than one out of every 1,600 filings (237,035 divided by 140). Accordingly, the categorical ban is based on a concern that arises in a very small percentage of the Court's cases.

More importantly, the links in the reasoning process that holds innocuous pins and buttons adversely affect how the Court appears, to an objectively reasonable member of the public, is even more attenuated in general employment litigation cases than it was in union cases. The additional step in the reasoning is that regalia-wearing unionized trial court employee will not only be biased in cases involving union issues, but also will not be impartial in cases where any employee, union or not, is a litigant.[14]

An analysis of the impact on public perception of the Court's employees should take into account their status as employees and as union members. First, a blanket suspicion that Court's employees would favor an employee litigant is not objectively reasonable. The shared status as employees is an insufficient basis for inferring bias or favoritism. Second, the additional fact that Court employees are unionized does not justify a blanket suspicion that they would not act impartially in case where an employee is a party. Simply because someone is the member of a union does not mean it is objectively reasonable to doubt their impartiality in a case where an employee is involved in some type of employment dispute. Third, a blanket suspicion of unionized trial court employees who wear an item of union regalia is not objectively reasonable. If such a suspicion were reasonable, the Legislature would have modified the Trial Court Act so

---

**14**    American history shows it is not reasonable to infer a union member automatically will favor an employee without regard to the matter in dispute. President Reagan once was the president of a union representing actors. Yet, in 1981, he fired approximately 11,500 members of the air traffic controllers' union when they remained on the picket lines. (*Skirlick v. Fidelity & Deposit Co. of Maryland* (D.C.Cir. 1988) 852 F.2d 1376, 1377, fn. 1.)

that it did not include the long-recognized employee right to wear pins and buttons. (See *Worcester*, *supra*, 805 N.E.2d at p. 53 [Massachusetts Legislature passed labor relations statute for public employees without explicitly overriding the well-established right to wear union insignia]; *Republic Aviation Corp. v. N.L.R.B.* (1945) 324 U.S. 793, 803, fn. 7 ["right of employees to wear union insignia at work has long been recognized"]; *East Whittier School District, supra,* PERB Dec. No. 1727, p. 13 [wearing union buttons is a protected right, absent special circumstances].) Thus, the wearing of regalia does not reasonably support the conclusions that such a Court employee automatically would favor the party who is an employee or that the regalia indirectly pressures judges or commissioners to favor the employee litigant.

The last layer in the analysis considers the impact on public perception created by a particular item of regalia. It is possible that a particular item could create reasonable doubts about impartiality. Based on my earlier discussion of the small pin and two-inch button, any doubts created by those particular items are not objectively reasonable. Relying on the subjective concerns of a litigant employer is not appropriate. As explained by our Supreme Court's view of impartiality, "'[t]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the *disinterested objective observer* whose doubts concerning the [employee's] impartiality provide the governing standard.' " (*Haworth*, *supra*, 50 Cal.4th at p. 389.)

Accordingly, the Court's evidence that 140 cases involving employment issues were filed with it in 2010 is not sufficient to carry the Court's burden of justifying a total ban on union regalia. Stated from another perspective, PERB did not err in weighing the evidence the Court presented about its caseload.

G.    Restrictions on Displays of Union Writing and Images

1.    *Background*

The fourth paragraph of personnel rule 17.3.1 addresses the display of writing and images by employees on Court property:  "Employees of the Court may not display writings or images that are not published by the Court in work areas that are visible to the public."

The ALJ's proposed decision stated this rule "is problematic because it creates a categorical restriction on *all* union writings and images without any room for the objective case-by-case balancing of interests required by PERB case law.  For example, it is unclear how the display of a union coffee mug … in a court reporter's private office, while nominally visible to the public, would detrimentally affect the Court's image of impartiality and neutrality."  PERB concluded the prohibition on the display of union writings and images in all work areas visible to the public, like the ban on wearing union regalia, was overly broad and interfered with rights protected by the Trial Court Act.

2.    *PERB's Analysis Does Not Contain Legal or Factual Error*

The same balancing test applied to items of union regalia worn by employees applies to the question of whether special circumstances justify the restrictions on displays of union writings and images in work areas.  Also, I agree the rule restricting such displays is drawn more narrowly than the categorical ban of union regalia as the rule restricting displays (1) does not apply to items published by the Court and (2) is limited to work areas visible to the public.

The evidence supports PERB's determination that the rule was overly broad.  The evidence presented includes two photographs of a mouse pad used at a computer terminal in the hallway outside of jury room 5A on the fifth floor of the main courthouse.  The mouse pad contains the Union's logo, but it does not appear to include any words or numbers, although it is difficult to state that conclusively as the computer's mouse is placed over the center of the pad in each picture.  It is inconceivable to me how an

24

objectively reasonable person would fairly entertain doubts about the impartiality of Court employees upon seeing the mouse pad, especially when such a member of the public also would be exposed to the Union bulletin board the Court maintains in the fifth-floor hallway. Similarly, PERB correctly determined that exposing the public to Union coffee mugs, when a member of the public walks by an open office door of an employee with such a mug, would not cause an objectively reasonable person to fairly entertain doubts about the impartiality of the Court. In other words, the evidence presented by the Court does not compel a finding of special circumstances that justify the ban of union writings and images from the offices of Court employees that are visible to members of the public when they are using those corridors. Rather, PERB's determination that the rule banning displays of writings and images in work areas visible to the public was overly broad is supported by the evidence and is not a misapplication of the test that balances employee rights against the employer's legitimate interest in appearing impartial.

II.        OTHER ISSUES

A.        Question of Law or Fact

PERB's decision implies it resolved a question of ultimate fact when it decided the Court's rules were not narrowly drawn to the special circumstances asserted as justification for the bans on union materials. The majority does not explicitly state whether it resolved a question of law or a question of ultimate fact when it determined that special circumstances justified the breadth of the Court's rules.

For the sake of clarifying the legal foundation of my analysis, I conclude a determination that a particular set of restrictions on union items are narrowly drawn to fit the special circumstances, established by the evidence, resolves a question of ultimate fact. This characterization is appropriate because the existence of special circumstances and the scope of the restrictions justified by those special circumstances are matters that

25

fall within PERB's area of expertise. (See *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 911-913.)

## B. Standard of Review

Because a question of ultimate fact is involved, when PERB affirmatively finds special circumstances justify a particular restriction on union regalia, that finding is reviewed under the substantial evidence rule. (§ 71639.4, subd. (b).) In contrast, when PERB determines (as it did in this case) that an employer has failed to carry its burden of demonstrating special circumstances justify the restriction as drawn, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the [employer] as a matter of law." (*Dreyer's*, *supra*, 218 Cal.App.4th at p. 838.) As explained in *Dreyer's*, " 'where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' " (*Ibid.*) Evidence compels a finding in favor of a petitioning employer as a matter of law when that evidence is (1) uncontradicted and unimpeached and (2) of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding. (*Ibid.*; see *Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership* (2015) 238 Cal.App.4th 370, 390; *Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 965.) In my view, this is the standard of judicial review applicable to PERB's determination that the Court did not carry its burden as to special circumstances.

## C. Redrafting the Personnel Rules

In closing, I recognize that it is not the role of this court, PERB or an ALJ to attempt to redraft the personnel rules so that they comply with the Trial Court Act. The Legislature has extended to trial court employees the right to meet and confer with trial courts over the content of court rules that affect protected rights before the Court can take

unilateral action.  (§§ 71360, 71634.2.)  Therefore, any redrafting of the personnel rules to allow some exercise of the rights protected by the Trial Court Act initially must go through that meet and confer process without the interference that might be created by dicta or an advisory opinion of this court.

There are innumerable ways to describe the items to be allowed or prohibited when balancing the Court's interest in the appearance of impartiality and the statutory right to wear union regalia.  This variety speaks directly to the importance of the meet and confer requirement imposed by the Trial Court Act.  The exact balance cannot be made on the record presented, but with appropriate good faith efforts by all parties, it is possible to have a workable rule that is not a categorical ban on all union regalia—whether that rule is the result of an agreement or its adopted by the Court unilaterally after negotiations.

_____
FRANSON, J.